(No. 67001.—

THE CITY OF BURBANK, Appellant, v. THE ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Appellees.

*Opinion filed April 20, 1989.*

Robert E. Mann and Gretchen A. Winter, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jacalyn J. Zimmerman, Special Assistant Attorney General, of Chicago, of counsel), for appellee Illinois State Labor Relations Board.

Jacqueline A. Kinnaman, of Chicago, for appellee American Federation of State, County and Municipal Employees.

JUSTICE CALVO delivered the opinion of the court:

The City of Burbank (the City) appeals from a decision of the appellate court (168 Ill. App. 3d 885), affirming the decision and order of the Illinois State Labor Relations Board (the Board) finding that the City had engaged in unfair labor practices under sections 10(a)(1), (a)(2), and (a)(3) of the Illinois Public Labor Relations Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1610(a)(1), (a)(2), (a)(3)) when it "reorganized" the structure of its public works department (the Department). The reorganization, which the Board found was motivated by antiunion animus, resulted in the discharge of only one employee—Robert Randle, a prounion foreman who was active in the organizational campaign which culminated in certification of the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME),

as the exclusive bargaining representative of the Department's employees.

On appeal, the City contends that (1) the appellate court employed an inappropriate standard of review, and (2) the decisions of the appellate court and the Board are contrary to the manifest weight of the evidence. We reject the City's contentions and affirm the judgment of the appellate court.

In July of 1984, AFSCME began organizing the Department's employees. At Robert Randle's request, an AFSCME organizer met with the Department's employees at their work site. During the meeting, the other departmental foreman, Norbert Maza, expressed his opposition to unionization. On August 15, 1984, an AFSCME representative and a number of the Department's employees attended a city council meeting to formally request that the City recognize AFSCME as the employees' exclusive bargaining representative. Randle spoke at the meeting, advocating that the City recognize AFSCME. The council deferred action on the request, pending receipt of a legal opinion from the city attorney.

According to Randle, he attempted to speak with Robert Herrmann, the City's administrator, after the meeting. Although Randle and Herrmann had been friends, Herrmann refused to talk to Randle because of Randle's role in AFSCME's organizational campaign. Herrmann did not talk to Randle again until the morning of August 1, 1985, when he confirmed that Randle had been discharged.

The morning after the meeting, prior to the start of the shift, the director of public works, James Seiler, interrupted a conversation between Randle and department employee Andrew Patellaro, to "angrily" inform Randle that he was not to discuss union business on company time. Subsequently, Seiler became distant,

speaking to Randle only when absolutely necessary, and progressively curtailing his duties and responsibilities.

When the city council next met on September 12, 1984, action on AFSCME's request for recognition was again postponed. Consequently, AFSCME filed a petition with the Board on September 28, 1984, seeking to represent the Department's employees. The City responded by challenging the appropriateness of AFSCME's requested bargaining unit, claiming, *inter alia*, that the two foremen were "supervisors" within the meaning of the Act, and thus should be excluded from the bargaining unit. Based on Randle's testimony, the Board determined that the foremen were not supervisors. The Board ordered a representation election to determine whether the Department's employees desired representation by an exclusive bargaining representative.

At the representation election, the City challenged Randle's eligibility to vote on the ground that Randle was a supervisor under the Act. The City contested the inclusion of the foremen in the bargaining unit and requested a reversal of the Board's earlier decision that the foremen were statutory employees. When its objections were dismissed on July 18, 1985, the City tried, unsuccessfully, to challenge the Board's unit determination in the circuit court. AFSCME was certified as the exclusive bargaining representative of the Department's employees on August 2, 1985.

Prior to Board certification, the city council, on July 31, 1985, enacted an ordinance which "restructured" the Department, eliminating the foremen positions and creating a new position of deputy director. The City did not have a drafted copy of the ordinance prepared until after the meeting. The authority purportedly vested in the new position of deputy director under the ordinance mirrored that accorded a supervisor under section 3(r) of the Act (Ill. Rev. Stat. 1985, ch. 48, par. 1603(r)).

Seiler, the director of public works, later testified before the hearing officer that he had never discussed or heard of any plan to reduce the Department's staff prior to the July 31, 1985, meeting. Harry Klein, the city treasurer, testified subsequently that as early as February of 1985 he had recommended to Seiler and other city officials, based on purely fiscal considerations, that the City restructure the Department. Klein said his recommendation was based, *inter alia*, upon an article he had read in the Illinois Municipal Review and his belief that it was cheaper and more efficient to have street repairs effected by private contractors. Seiler testified that the City had saved a substantial amount of money by having the Department's employees do the work, and the work done by the Department's employees was as good or better than that completed by private contractors. The hearing officer subsequently determined that the article Klein claimed to have relied on in making his February 1985 recommendation was not published before July or August of 1985. Because of the internal inconsistencies in Klein's testimony and the conflicts with the testimony of Seiler, the hearing officer rejected Klein's testimony as not credible.

Only one Department employee was affected by the restructuring—Robert Randle. On August 1, 1985, the day after the meeting, and upon his arrival at work, Randle was informed that he was no longer employed by the City. When Herrmann arrived, he confirmed that Randle had been terminated. Neither Herrmann nor Seiler gave Randle a reason for his dismissal.

On August 5, 1985, AFSCME filed an unfair labor practice charge in connection with Randle's discharge. The Board issued a complaint and the matter was heard by a hearing officer on November 20, and December 13 and 18, 1985. AFSCME claimed that the ordinance was enacted to remove the foremen positions from the bar-

gaining unit and to terminate Randle. The City denied any improper motive behind enactment of the ordinance, claiming that the ordinance was enacted in response to fiscal exigencies. It was only after issuance of the hearing officer's recommended decision and order that the City first raised as a justification for its action the need to maintain "first-line supervision" in the Department. The hearing officer rejected the City's position, noting the inconsistencies in the testimony of Klein and Seiler. The hearing officer issued a recommended order calling for reinstatement of Randle in his former position, or a comparable one, with back pay and benefits.

The Board adopted the hearing officer's recommended order, stating:

> "We do not condone pretextual actions taken by a public employer, under the guise of 'legitimacy', which are actually intended to, and have the effect of, subverting the Illinois Public Labor Relations Act and denying employees its rights and protections."

The Board noted the timing of the City's "abrupt" reorganization, that no discussion preceded it, and that the City presented "no credible evidence *** to support any economic justification." Moreover, the Board considered the City's argument concerning first-line supervision and rejected it, finding "the City's 'reorganization' did not alleviate any alleged 'first-line supervision' problems; indeed, it did not change the Department's structure at all, except to rid itself of a known union adherent." The Board considered the City's shift in its justification as further proof that its motive was unlawful and rejected that claim as a pretext, unworthy of belief. While the Board acknowledged that an employer can reorganize its departments for any legitimate reason, it stated that an employer cannot do so when its purpose is to evade the requirements of the Act. The Board found that the City's reorganization was motivated "solely" by its de-

sire to deny its employees their rights under the Act. The Board ordered Randle reinstated to a position comparable to the one he had previously held, with back pay and benefits, and ordered Maza's appointment as deputy director rescinded. Contemporaneously, the Board dismissed unit clarification petitions the City had filed.

In addressing the unfair labor practice issue, the appellate court identified the key question as whether the discharge of Randle was motivated by antiunion animus. The court acknowledged the City's contention that its action was prompted by the need to maintain "first-line supervision," then placed the burden on the employer to prove, by a preponderance of the evidence, that the City was "principally motivated by legitimate business reasons." (168 Ill. App. 3d at 893.) The court stated that it was required to "determine whether substantial evidence sustains the Board's conclusion that the City's actions were partly or wholly motivated by the purpose of discouraging union activity." (168 Ill. App. 3d at 893-94.) The appellate court approved the Board's use of circumstantial evidence and listed factors which the Board could consider in determining whether antiunion animus motivated the discharge, such as, (1) the company's knowledge of the employee's union activities, (2) the timing of the discharge as it related to union activities, and (3) the employer's pattern of conduct. The court found that the Board's decision was not against the manifest weight of the evidence in that circumstantial evidence was presented which established "both the City's knowledge of Randle's union activities and a pattern of conduct meant to discourage unionizing efforts." (168 Ill. App. 3d at 895.) The appellate court concluded that "[e]vidence of either of these facts would have been sufficient to support the Board's finding that the City's attempted reorganization was pretextual and that Randle's discharge was motivated by antiunion animus." 168 Ill. App. 3d at 895.

As a preliminary step in our analysis, we note that the interpretation placed on a statute by the agency charged with its administration and enforcement, while not binding (*Northern Trust Co. v. Bernardi* (1987), 115 Ill. 2d 354, 365), is generally accorded deference by the courts (*Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536). Moreover, we deem it appropriate, in light of the close parallel between section 10(a) of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1610(a)) and section 8(a) of the National Labor Relations Act (NLRA) (29 U.S.C. §158(a) (1982)), to examine Federal interpretations of the NLRA where those decisions are consistent with the purposes of our Act. Of course, where the legislature has modified the Act, or otherwise departed from the NLRA's statutory scheme, it can be inferred that it intended a different result, and, with respect to those changes, Federal authority may be of limited value. With these principles in mind, we first consider the City's contention that the appellate court employed an inappropriate standard of review, and accorded undue deference to the Board's interpretation of the Act.

Where an employer is charged with an unfair labor practice because of the discharge of an employee engaged in protected activity, the charging party must first show, by a preponderance of the evidence, that the adverse employment action was "based in whole or in part on antiunion animus—or *** that the employee's protected conduct was a substantial or motivating factor in the adverse action." (*NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 401, 76 L. Ed. 2d 667, 675, 103 S. Ct. 2469, 2474.) Since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence, and, because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence. (*NLRB v. Nueva Engineering, Inc.* (4th Cir. 1985), 761 F.2d 961,

967.) Antiunion motivation may reasonably be inferred from a variety of factors, such as an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities (*Turnbull Cone Baking Co. v. NLRB* (6th Cir. 1985), 778 F.2d 292, 297), proximity in time between the employees' union activities and their discharge (*NLRB v. E.I. DuPont De Nemours* (6th Cir. 1984), 750 F.2d 524, 529), disparate treatment of employees or a pattern of conduct which targets union supporters for adverse employment action (*Eisenberg v. Wellington Hall Nursing Home, Inc.* (3d Cir. 1981), 651 F.2d 902, 905; *NLRB v. Supreme Bumpers, Inc.* (6th Cir. 1981), 648 F.2d 1076, 1077), inconsistencies between the proffered reason for discharge and other actions of the employer (*Turnbull*, 778 F.2d at 297), and shifting explanations for the discharge (*NLRB v. Dorothy Shamrock Coal Co.* (7th Cir. 1987), 833 F.2d 1263, 1268; *NLRB v. Rich's Precision Foundry, Inc.* (7th Cir. 1981), 667 F.2d 613, 626).

Once the charging party has established a case of discharge based in part on antiunion animus, the employer can avoid a finding that it violated the statute by demonstrating that the discharged employee would have been fired for a legitimate business reason notwithstanding the employer's antiunion animus. (*Transportation Management Corp.*, 462 U.S. at 401-02, 76 L. Ed. 2d at 675-76, 103 S. Ct. at 2474; *Communication Workers of America, Local 5008 v. NLRB* (7th Cir. 1986), 784 F.2d 847, 850.) Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, for it must be determined whether the reasons advanced are *bona fide* or pretextual. If the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry. (*Marathon LeTourneau Co. v. NLRB* (5th Cir. 1983), 699 F.2d 248, 252.) However, where the employer advances legitimate reasons for the discharge

and is found to have relied upon them in part, then the case is characterized as one of "dual motive" and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement. *Transportation Management Corp.*, 462 U.S. at 400-02, 76 L. Ed. 2d at 674-76, 103 S. Ct. at 2473-74; *Roscello v. Southwest Airlines Co.* (5th Cir. 1984), 726 F.2d 217, 222-23.

The foregoing principles were discussed at length and relied upon in *Hardin County Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, and *Rockford Township Highway Department v. Illinois State Labor Relations Board* (1987), 153 Ill. App. 3d 863. While *Hardin County* represents an excellent exposition of the development of the "in part" and "but for" tests as they pertain to unfair labor practice charges in Federal and State jurisdictions, we do not deem it necessary to chronicle the development of Federal labor law here, as we find that the standards previously discussed strike the appropriate balance between the employee's right to protection from an employer's antiunion hostility and the employer's right to discharge the employee for legitimate business reasons.

We find that the appellate court in this case applied the proper standard of review; however, we hasten to point out two instances where the court's analysis may lead to confusion in future cases. The court noted that the City had advanced a legitimate business reason to justify Randle's discharge; the court then proceeded to a "dual motive" analysis. The court appears to have accepted the proffered reason for Randle's discharge at face value, without having determined whether the reason advanced was *bona fide* or pretextual. Only *after* the reason advanced by the employer has been found to be *bona fide* does the dual motive analysis come into play.

(*Roscello*, 726 F.2d at 222.) We are also troubled by the court's statement that evidence of either the City's knowledge of Randle's union activities or the City's antiunion pattern of conduct would have been sufficient to support the Board's finding that the City's reorganization was pretextual. We are aware of no case where an employer's knowledge of an employee's union activities, without more, has been held to establish that a discharge was motivated by antiunion animus. *Turnbull*, the case the court cited for the proposition that an employer's knowledge of the employee's union activities may be considered as evidence of discriminatory motivation, required a finding that an employer had expressed hostility towards unionization "together with" knowledge of the employee's activities before antiunion motivation could be inferred. (*Turnbull*, 778 F.2d at 297.) These analytical aberrations notwithstanding, the appellate court correctly concluded that the City violated the Act when it discharged Randle and that its purported justification was pretextual. 168 Ill. App. 3d at 895.

Randle had been a union activist in AFSCME's organizing campaign. The City admits it was aware of his activities. Randle spoke in favor of recognizing the union at the August 15, 1984, city council meeting. Although he had been on good terms with Robert Herrmann, the City's administrator, and James Seiler, the director of the department of public works, Herrmann refused to speak with Randle after the meeting and, in fact, did not speak with Randle again until August 1, 1985, when he confirmed that Randle had been discharged. Seiler became distant after the meeting. The day after the meeting, Seiler interrupted a conversation Randle was having with Andrew Patellaro to "angrily" inform Randle that he was not to discuss union business on company time. Randle's responsibilities were gradually curtailed until on August 1, 1985, two days before the union was to be certified, Ran-

dle was discharged. The timing of the City's change in attitude toward Randle coincides with Randle's overt support for the union. Antiunion motivation may be inferred from an employer's expressed hostility towards unionization, together with knowledge of the employee's union activities. *Turnbull*, 778 F.2d at 297.

While we do not attribute any antiunion sentiment to the City by reason of its challenge to the inclusion of Randle and Maza in the bargaining unit, the timing of Randle's discharge, two days before certification, is telling. Moreover, the "reorganization" resulted in the discharge of Randle, the prounion foreman, and the promotion of Maza, the antiunion foreman. Although Maza was given a new job title, his duties did not change significantly. Other than Randle, the union's most visible supporter, no one was affected adversely by the reorganization. This targeting of Randle for discharge raises an inference of antiunion animus. (*Eisenberg*, 651 F.2d at 905; *Supreme Bumpers*, 648 F.2d at 1077.) Furthermore, the City's actions were inconsistent with its proffered reason for discharge. (See *Turnbull*, 778 F.2d at 297.) Before the hearing officer, Klein testified that he had discussed the reorganization with Seiler as early as February of 1985; however, Seiler, the director of the Department, had not heard of the reorganization prior to the July 31, 1985, city council meeting. If indeed the City planned to reorganize the Department for fiscal reasons, surely Seiler would have been apprised *before* the action was taken. This evidence is sufficient to establish antiunion animus.

The City was unable to proffer a credible justification for Randle's disharge. As previously noted, Harry Klein, the city treasurer, testified that as early as February of 1985 he had recommended to Seiler and other City officials, based on purely fiscal considerations, that the City restructure the Department. Klein said his report was based, *inter alia,* upon an article he had read and his be-

lief that it was cheaper and more efficient to have street repairs effected by private contractors. It was later determined that the article Klein claimed to have read and relied upon in February of 1985 was not published until July or August of 1985. Seiler, the director of public works, testified that he had never discussed or heard of any plan to reduce the Department's staff prior to the July 31, 1985, closed meeting in which the reorganization ordinance was enacted. Moreover, Seiler stated that the City had saved a substantial amount of money by having the Department's employees do the work, and the work done by Department employees was as good or better than that completed by private contractors. The hearing officer was justified in rejecting the City's position, which was based on the contradictory testimony of its own management personnel. In addition, as the Board noted in adopting the hearing officer's recommended decision, the City had attempted to shift defenses, first claiming that the "reorganization" was prompted by fiscal considerations, then, after the hearing officer rejected its initial explanation, claiming that reorganization was necessary to assure effective "first-line supervision." The reason the City proffered for the discharge was pretextual. The decision of the Board is not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the appellate court is affirmed as modified.

*Judgment affirmed.*

JUSTICE WARD took no part in the consideration or decision of this case.