FARMERS STATE BANK OF McNABB, Plaintiff-Appellant, v. THE DEPARTMENT OF EMPLOYMENT SECURITY et al., Defendants-Appellees (Carol A. Pelz, Defendant).

Third District   No. 3—90—0512

Opinion filed July 26, 1991.

GORMAN, J., dissenting.

William J. Wimbicus, Jr., of Spring Valley, and Scott Madson, of Princeton, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and John A. Morrissey, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE SLATER delivered the opinion of the court:

The plaintiff, Farmer's State Bank of McNabb (bank), appeals the circuit court's judgment affirming an administrative order by the Board of Review of the Illinois Department of Employment Security (hereinafter Board). That order allowed unemployment benefits to a former employee of the bank, Carol A. Pelz (claimant). The issue before this court is whether the Board erred in finding that the claimant did not engage in "misconduct" as that term is defined by statute. We affirm.

Claimant was hired by the bank in August of 1953. She progressed to a position as assistant cashier in 1969. In December 1971, her employment changed from full-time to part-time status. She maintained that position until she was forced to resign on April 15, 1988. Her responsibilities had been diminished over this period, particularly after a change of senior management in 1987. At the time of her discharge, the claimant was working three days per week and did not supervise any bank employees.

At some point, many years before the principal events of this case took place, the bank's internal auditors implemented a system whereby certain items that previously had been held at the back of the tellers' drawers would be put in a central storage location referred to variously as "drawer five" or "box five." Items that would be put into drawer five included redeemed United States Savings Bonds, torn currency, certain checks requiring endorsements, and certain checks which would have resulted in overdrafts if put through the normal processing channels. As part of the daily reconciliation process, the total dollar amount of the items in this drawer was counted as cash, thus permitting the bank's books to balance. The person assigned to determine the amount of the items in this box on any given day did not necessarily determine the amount of each item, but often relied on subtotals written on the face of envelopes containing items of the same type.

Most checks put into drawer five were placed there as accommodations to customers of the bank where special arrangements had been made to permit customers to rectify problems with endorsements or to deposit money to prevent overdrafts. Normally, the customers would take the necessary action within a few days, at most. Aside from customers, however, there had been various occasions when some of the employees, officers, and directors of the bank had been allowed to deposit money to prevent overdrafts in their personal checking accounts. To accomplish this, the checks which would have caused the overdrafts were kept in drawer five for a short period of time until the necessary deposit would be made.

In February and early March of 1988, an employee of the bank took advantage of this system. The employee arranged to have three of her personal checks, totaling over $12,000, diverted from the normal processing channels and put into an envelope in drawer five. The effect of this was that the checks were paid by the bank, but the corresponding amounts were not debited to the employee's checking account. Claimant first discovered this state of affairs on March 15, 1988, when she was doing some work in connection with drawer five and inspected the contents of the envelope containing the three checks. The claimant testified as follows before a hearing referee of the Illinois Department of Employment Security:

"Q. [Claimant's attorney:] What *** if anything did you do after you made this discovery?

A. I went to one of the other long time employees *** and asked her if she knew that Darlene [the employee whose checks were in the box] had checks in No. 5, and she said, yes that she did. She'd been aware of it for a couple of weeks.

Q. Had you seen those particular checks any time earlier than March 15th?

A. No.

Q. *** [D]id you consider whether or not you should report this incident to management that day, the 15th?

A. Well I was shocked when I saw them, and I went to [the other long-term employee], and [she] said that she had been aware of it for a couple of weeks and that she had talked to Darlene and Darlene said she was going to take care of it.

* * *

Q. [Bank's attorney:] When [was it that] you first became aware that Darlene *** had these overdrafts, what date again did you state that was, March 15th?

A. I wasn't aware that she had an overdraft. I was aware that she had checks in there on March the 15th but [*sic*] evidently she didn't have the money for, or she wouldn't have them in there. And I didn't, I didn't go check her account at that time."

The claimant next worked on March 18, 1988. Upon discovering that the employee's checks were still in drawer five, she confronted the employee. The employee assured the claimant that the checks would be covered soon by payments from a government agricultural program for which she and her husband had applied. While claimant had serious doubts about whether the employee would cover the checks, she did not notify management of the situation on that day.

When claimant next worked on March 21, 1988, she found that the employee's checks were still in drawer five. Claimant testified concerning what happened next before the hearing referee as follows:

"Q. [Claimant's attorney:] What happened on [March 21, 1988]?

A. On that day I told [the other long-term employee] that I was going to go and tell management about the situation, if she wanted to come with me, that was fine, and if she didn't, I'd do it on my own. And she said she thought that we should, she would come with me and she thought that we should tell Darlene first what we were going to do.

So [she] and I did, we took Darlene into the board room and told her that we were going to have to tell that she had checks in there. And she asked if she, if we wanted her to tell. And I said, I don't care who tells, but somebody is going to have to tell before I go home tonight. So she said she would tell Tom, the Loan Officer."

Around three o'clock that afternoon the employee whose checks were in drawer five talked to the loan officer. Afterwards the claimant met with the loan officer to make sure that he had been advised of the extent of the problem.

On April 15, 1988, the claimant was called to a meeting at the bank. She was then presented with and requested to sign a resignation. Bank officials told her that she would be fired if she did not sign it immediately. She signed the proffered form, but later sought to rescind her resignation. The bank refused to allow claimant to return to work at the bank.

On May 25, 1988, the claimant applied for unemployment benefits from the Illinois Department of Employment Security. After her claim was denied, she appealed the denial to a referee. The referee conducted a hearing at which witnesses were sworn, and which was later tran-

scribed. On August 1, 1988, the referee found the claimant to be ineligible for unemployment benefits for having engaged in "misconduct" as that term is defined in section 602(A) of the Unemployment Insurance Act (Ill. Rev. Stat. 1987, ch. 48, par. 432(A)). The claimant appealed next to the Board, which on April 6, 1989, reversed the decision of the referee, finding that the claimant's conduct was not a "deliberate and willful" violation of the bank's rules or policies. The bank filed its complaint for administrative review in the circuit court on May 2, 1989. The circuit court affirmed the decision of the Board, finding the Board's decision not to be against the manifest weight of the evidence. The bank appealed the circuit court's decision to this court.

Section 602(A) of the Unemployment Insurance Act (Ill. Rev. Stat. 1987, ch. 48, par. 432(A)) states in relevant part:

"An individual shall be ineligible for benefits for the week in which he has been discharged for misconduct connected with his work and, thereafter, until he has become reemployed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks ***. *** For purposes of this subsection, the term 'misconduct' means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit."

In cases involving disputes over eligibility for unemployment benefits, it is the decision of the Board that is subject to review, not that of the referee. (See *Carroll v. Board of Review* (1985), 132 Ill. App. 3d 686, 690, 477 N.E.2d 800, 803.) The findings and conclusions of the Board on questions of fact shall be held to be *prima facie* true and correct. See Ill. Rev. Stat. 1987, ch. 48, par. 520; Ill. Rev. Stat. 1987, ch. 110, par. 3—110.

■ The statutory definition of misconduct requires violation of a reasonable rule or policy of the employing unit. (Ill. Rev. Stat. 1987, ch. 48, par. 432(A).) The Board found that the bank had no rule requiring an officer or an employee to report to management a situation such as occurred in this case.

A finding of misconduct requires a finding of a deliberate and willful violation of a reasonable rule or policy of the employer. (Ill. Rev. Stat. 1987, ch. 48, par. 432(A).) The Board found that the bank had a longstanding practice of allowing the use of drawer five to hold checks of officers and employees until funds could be deposited to cover the checks. This practice was confirmed by the testimony of John McKirgan,

the bank's former long-time employee and president. Therefore, the Board did not accept the bank's argument that the claimant's failure to report the use of drawer five in this manner constituted a deliberate and willful violation of a reasonable rule or policy of the bank, particularly where there were no formalized rules or policies on the subject. The record is uncontradicted that there were no formalized rules concerning the use of drawer five.

The Board concluded that "the claimant's action can, at most, be characterized as an error in judgment and not a willful disregard of duties owed the employer." The Board noted that it was through the efforts of the claimant that the problem ultimately came to the attention of management.

The statutory definition of misconduct requires that the violation harm the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit. (Ill. Rev. Stat. 1987, ch. 48, par. 432(A).) Since no other employees were harmed and since the violation here was never engaged in before by the claimant, the claimant can only be found to have engaged in disqualifying misconduct if the violation harmed the bank.

The bank claims that it was harmed because it was threatened with loss of bonding coverage if it did not discharge the claimant. While this might be a good argument, and might even be true, the record fails to substantiate that the bank indeed was so threatened. The only evidence in the record on this point is a letter to the bank from the bank's insurance agency indicating that the agency was referring the matter to the insurance carrier. The agency's letter reminded the bank of certain policy provisions requiring termination of coverage for involved persons if a fraudulent act would have been discovered by an officer who then failed to report the matter. While the letter attached a copy of the relevant section of the insurance policy, the version in the record is illegible. We will not simply accept the agency's characterization of the effect of the policy language without support in the record. Furthermore, there is no evidence in the record that the insurance carrier actually demanded that the claimant be discharged in order to continue coverage.

The Board found that since the bank had already paid out funds on the checks in drawer five prior to the claimant's discovery of them, the bank was not harmed by the delay of six days (three working days) between the time the claimant discovered the checks and the time the matter was brought to the attention of management.

The bank asserts the claimant was discharged for allegedly failing to report the misapplication of funds by her co-worker within 48 hours of discovery to a superior in a manner enabling the bank to comply with

State reporting requirements. The statute cited by the bank for this position is section 47 of the Illinois Banking Act (Ill. Rev. Stat. 1987, ch. 17, par. 358), effective August 21, 1987, which provides, in pertinent part, as follows:

"[A]ny bank which is a victim of a robbery, a shortage of funds in excess of $10,000 or of the apparent misapplication of the bank's funds by an officer, employee or director, shall report such robbery, shortage or apparent misapplication to the Commissioner within 48 hours from the date discovered." (Ill. Rev. Stat. 1987, ch. 17, par. 358.)

There is nothing in the record to support the bank's position on this issue. The bank had no formalized rules concerning drawer five and no specific rule limiting the duration of time a check could be held in drawer five. Furthermore, the record is devoid of any testimony that the aforementioned statute had been brought to the attention of this claimant or any bank employee.

The record establishes that it was the claimant who ensured that the misapplication of funds by the co-worker was brought to management's attention. The Board found the claimant's acts, at most, can be characterized as an error in judgment and not a willful disregard of duties owed the bank. We agree.

The Board found that claimant was discharged for reasons other than misconduct connected with her work and that she was not subject to disqualification of benefits under the provisions of the Unemployment Insurance Act. There is ample evidence in the record to support this finding.

■ In reviewing the factual findings of an administrative decision, a reviewing court may not reweigh the evidence or substitute its judgment for that of the administrative agency. See *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688 ("It is axiomatic that a reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact"); *Berry v. Edgar* (1989), 192 Ill. App. 3d 455, 459, 548 N.E.2d 575, 578 (A court on review of an administrative decision may not "reweigh the evidence or make an independent determination of the facts").

Courts may not interfere with the discretionary authority of administrative agencies unless the authority is exercised in an arbitrary or capricious manner or the administrative decision is against the manifest weight of the evidence. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 513, 475 N.E.2d 879, 885; *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 469 N.E.2d 1085.) Wide latitude must be given to an agency's exercise of its discretion. (*Neff v. Miller* (1986), 146 Ill. App. 3d 395, 401, 496

N.E.2d 1073, 1078.) If *any* evidence fairly supports the action of an administrative agency, its decision is not against the manifest weight of evidence and must be sustained on review. (*Berry*, 192 Ill. App. 3d at 459, 548 N.E.2d at 578.) Stated another way:

> "It is well settled that the factual findings of an administrative agency are deemed *prima facie* true and correct and the agency's decision based thereon may be disturbed by a court sitting in administrative review only where that decision is contrary to the manifest weight of the evidence. [Citation.] A decision is contrary to the manifest weight of the evidence only when, after reviewing the evidence in a light most favorable to the administrative agency, the court determines that no rational trier of fact could have agreed with the agency's decision ***. If the record contains any evidence supporting the administrative agency's decision, the decision must be sustained on review. [Citation.]" *Bultas v. Board of Fire & Police Commissioners* (1988), 171 Ill. App. 3d 189, 193-94, 524 N.E.2d 1172, 1174-75.

In addition, an administrative agency's decision is not contrary to the manifest weight of the evidence merely because the court may have decided the case differently in the first instance. (*Collura v. Board of Police Commissioners* (1985), 135 Ill. App. 3d 827, 835-36, 482 N.E.2d 143, 147.) None of the Board's findings were against the manifest weight of the evidence.

Additionally, although a court is not formally bound by an agency's interpretation of law, it should accord substantial weight and deference to the interpretation of a statute which the agency administers and enforces. *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149; *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536, 508 N.E.2d 1058, 1062.

The judgment of the trial court upholding the findings and order of the Board of Review of the Illinois Department of Employment Security is affirmed.

Affirmed.

McCUSKEY, J., concurs.

JUSTICE GORMAN, dissenting:

I respectfully dissent.

In order for an employee to be guilty of misconduct within the meaning of section 602(A) of the Unemployment Insurance Act (Ill. Rev. Stat. 1987, ch. 48, par. 432(A)), there must be a rule or policy of the

employing unit which the employee has violated (see Ill. Rev. Stat. 1987, ch. 48, par. 432(A)). However, the rule or policy involved does not necessarily have to be written or otherwise formalized. Standards of behavior which an employer has a right to expect constitute reasonable rules and policies. (See *Bandemer v. Department of Employment Security* (1990), 204 Ill. App. 3d 192, 195, 562 N.E.2d 6, 7.) A bank has a right to expect that its officers and employees who discover a significant misapplication of bank funds will promptly bring that to the attention of management. That legitimate expectation constitutes a reasonable rule or policy within the meaning of those terms in section 602(A).

A finding of misconduct requires a finding of a deliberate and willful violation of a reasonable rule or policy of the employer (Ill. Rev. Stat. 1987, ch. 48, par. 432(A)). The Board essentially argues that since the bank had a long-standing practice of allowing the use of drawer five to hold checks of officers and employees until funds could be deposited to cover the checks, and since the bank had no formal rules or policies regarding this practice, the claimant had no notice that the offending employee's conduct constituted a misapplication of bank funds. Without such notice, the argument goes, the claimant could not have deliberately and willfully violated the unexceptionable, though unstated, rule or policy requiring prompt reporting of misapplications of bank funds. This argument would have considerable merit if the checks had been in drawer five for only a few days when the claimant discovered them. However, that was not the case.

The claimant's testimony makes it clear that when she discovered the checks at issue on March 15, 1988, she immediately realized that this was a situation unlike the situation where an officer or employee had a check in drawer five overnight or for a few days. If inspection of the checks at that time did not reveal to the claimant that they had been in drawer five for approximately two weeks, then her discussion on that date with the other long-time employee revealed that fact to her. Her persistence in pursuing the matter until it was resolved shows concern for the bank's interests, but it also shows her awareness that the matter was beyond the scope of the long-standing practice of allowing officers and employees to keep checks in drawer five for at most a few days and that it constituted a serious problem.

While the claimant's motive for acting as she did seems to have been to protect the bank's interests without unnecessarily exposing a fellow employee to some potentially serious sanctions, a good motive such as this will not insulate the claimant from being found to have engaged in misconduct as defined by section 602(A). The claimant had no right to give the offending employee additional time to rectify the prob-

lem at the bank's peril, which is essentially what the claimant did. The evidence is clear that the claimant realized that a misapplication of funds had occurred, deliberately and willfully delayed almost a week in reporting the problem to management, and in so doing violated the reasonable rule or policy that misapplications of bank funds be reported to management promptly after their discovery.

The Board argues that since the bank had already paid out funds on the checks in drawer five before the claimant discovered them, the bank was not harmed by the delay of six days between the time the claimant discovered the checks and the time the matter was brought to the attention of management. This view of harm is too limited. It ignores the harm of almost a week's exposure by the bank to further losses from further checks that might have been put through the system and into drawer five by the employee whose checks were already in drawer five. A deliberate and willful violation of a reasonable rule or policy, where the violation will result in a substantially increased risk of loss by the employer, is precisely the kind of behavior which merits a denial of unemployment benefits. The record shows that the bank was harmed by the violation of a reasonable rule or policy.

The soundness of financial institutions is of great public concern. It is critical that misapplications of funds from such institutions be detected and reported promptly to prevent further misapplications and to allow recovery of funds already misapplied. In my view, to hold that a bank officer could delay almost a week in reporting what she had to know was a misapplication of bank funds and only be guilty of an error in judgment contravenes public policy. To hold otherwise permits awarding of unemployment benefits where the statute and public policy dictate that such benefits should not be awarded.

I believe this court should reverse the decision of the circuit court. Accordingly, I dissent.