ROCKFORD DROP FORGE COMPANY, Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Appellees.

Second District   No. 2—91—0342

Opinion filed November 20, 1991.

John W. France, Stephen E. Balogh, and Carl A. Ecklund, all of Williams & McCarthy, P.C., of Rockford, for petitioner.

Roland W. Burris, Attorney General, and Ronald L. Schallawitz, of Environmental Protection Agency, both of Springfield, and Marvin I. Medintz, of Pollution Control Board, of Chicago (Carol J. Ludwig, Assistant Attorney General, of Chicago, of counsel), for respondents.

JUSTICE INGLIS delivered the opinion of the court:

Appellant, Rockford Drop Forge Company (Rockford), appeals from a final order of the Illinois Pollution Control Board (Board) denying Rockford reimbursement from the Underground Storage Tank Fund (Fund) (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.13) for certain cleanup costs associated with an underground storage tank leak. The Board affirmed an earlier decision by the Illinois Environmental Protection Agency (IEPA). We have jurisdiction pursuant to section 41(a) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 1041(a)). The sole issue for our review is which of two conflicting definitions for "underground storage tanks" (UST), both of which were in effect at the time, applied when the IEPA processed Rockford's application for cleanup cost reimbursement from the Fund. For reasons set forth below, we affirm the Board's decision denying Rockford reimbursement from the Fund.

Rockford owns two parcels of property which are separated by 9th Street, a public road owned by the City of Rockford. The west parcel contained 10 underground tanks installed sometime between 1925 and 1949. The tanks ranged in capacity from 20,500 to 22,000 gallons each. Rockford kept fuel oil in the tanks, using 85% to 90% of the oil to heat forge furnaces located in the forge shop on the east parcel. That oil was pumped through pipes underneath 9th Street to the forge shop. Rockford used 10% to 15% of the stored fuel for the operation of forklift trucks and other equipment.

Rockford registered the tanks with the Office of the State Fire Marshall (OSFM) on February 4, 1986, paying a $100 registration fee for each tank. Rockford was told by the OSFM representative that if the tanks were registered they would be covered by the UST Fund, which at the time was yet to be established. The OSFM representative said that Rockford's tanks were UST's as defined by the OSFM regulations and, therefore, within the meaning of the statutory UST program. Rockford was also informed that failure to register the tanks could subject the company to penalties.

In 1989 Rockford converted its forging operation from oil to natural gas. Rockford removed five of the oil tanks in October 1989 and then removed the remaining five tanks in November 1989. On October 3, 1989, Rockford discovered that one of the tanks had leaked. Rockford spent approximately $49,000 to clean up the area around the leak.

On January 3, 1990, Rockford filed an application with IEPA for cleanup cost reimbursement from the UST Fund. On January 12, 1990, IEPA denied Rockford's application, stating:

"The definition of underground storage tank does not include any tank used for storing heating oil for consumptive use on the premises where stored. *** Since your tank held fuel oil that was consumed for process heating, your tank is exempt from the underground storage tank (UST) regulations according to the definition of an UST."

Rockford requested reconsideration of IEPA's decision. In a three-page letter to Rockford dated March 9, 1990, IEPA again stated that the 10 tanks were excluded from the UST Fund because the oil from the tanks was used for "consumptive use on the premises where stored."

Rockford appealed IEPA's decision to the Pollution Control Board. On December 20, 1990, the Board issued a written order upholding the reimbursement denial. Two of the Board's seven members dissented.

The Board stated that the issue was whether Rockford's tanks fell within the exclusion to the UST definition set forth in section 22.18(e)(1)(A) of the Act. At the time Rockford filed its application and the agency rendered its decision, section 22.18(e)(1)(A) provided that for purposes of the Act:

"The terms 'petroleum' and 'underground storage tank' shall have the meanings ascribed to them in Subtitle I of the Hazardous and Solid Waste Amendments of 1984 (P.L. 98—616), as amended, of the Resource Conservation and Recovery Act of

1976 [RCRA] (P.L. 94—580), as amended." (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.18(e)(1)(A).)

RCRA defines the term "UST" as excluding any "tank used for storing heating oil for consumptive use on the premises where stored." (42 U.S.C.A. §6991(1)(b) (West Supp. 1991).) Board regulations in effect at the time defined UST's using identical language to that of section 6991(1)(b) of RCRA. (35 Ill. Adm. Code §731.112 (1989).) The Board stated that Rockford's claim for reimbursement would turn on interpretation of the phrases "consumptive use" and "on the premises where stored." Relying on explanations and definitions in the preamble to the relevant section of the Code of Federal Regulations (EPA Requirements for Owners and Operators of Underground Storage Tanks, 40 C.F.R. §280.12 (1989)), the Board found that the tanks fell within the explanation of "consumptive use" since the heating oil was consumed on site and not sold. The Board treated the 10% to 15% used to fuel forklifts as a *de minimis* amount which did not alter its conclusion.

The Board next determined whether the facts that the tanks were located on the west parcel and that the forging furnaces were located across 9th Street on the east parcel meant that the tanks were not used "on the premises where stored." The Board invoked *Eureka Co. v. Environmental Protection Agency* (1979), PCB 98—117, where the Board was called upon to interpret the term "on-site." In *Eureka,* the Board held that two or more pieces of property which are geographically contiguous and are divided by a public or private right-of-way are considered a single site. (*Eureka* (1979), PCB 98—117, at 2.) Similarly here, the Board concluded that the oil in Rockford's tanks on the west parcel was for use "on the premises where stored," even though the use occurred across 9th Street on the east parcel.

The Board was sympathetic to Rockford's argument that it had in good faith registered the tanks with the OSFM and in fact had been assured by the OSFM that the tanks were UST's as defined by OSFM regulations and therefore would be covered by the UST Fund. The Board recognized "the confusion encountered by Rockford as a result of the dual-implemented UST system." The Board also recognized that section 22.18(e)(1)(A) of the Act now defines UST's to include tanks such as Rockford's because of a statutory amendment (Pub. Act 86—1050, eff. July 11, 1990). Public Act 86—1050 added the following language to section 22.18(e)(1)(A): "except that 'underground storage tank' shall include heating oil tanks greater than 1,100 gallons in capacity serving other than residential units." Public Act 86—1050 also added identical language to the applicable OSFM statute (Ill. Rev.

Stat. 1989, ch. 127½, par. 156(e)(1)). At the time of Rockford's application for reimbursement, however, an OSFM regulation provided that the definition for UST's included all heating oil tanks greater than 1,100 gallons. (41 Ill. Adm. Code §170.400(jj)(1)(B) (1989).) So, while at the time of Rockford's application for reimbursement the tanks were UST's under OSFM regulations but not under IEPA statute, the tanks would now be considered UST's under either OSFM or IEPA statute. While sympathetic to Rockford's predicament, the Board concluded that Rockford's tanks were exempt from UST Fund coverage because the IEPA statute and regulations in effect at the time excluded Rockford's tanks from the definition of UST's.

Two members of the Board filed a dissenting opinion which argued that Rockford should be granted reimbursement from the UST Fund because Rockford had in good faith complied with OSFM regulations and because of the conflicting UST definitions. The dissenting opinion concluded:

"We in government need to make every effort to avoid a situation such as this, where persons place reliance on a system that borders on the irrational. It does not serve the purposes of achieving a clean environment that persons who voluntarily comply are 'led down the garden path' in this manner."

On January 29, 1991, Rockford filed a motion for reconsideration with the Board. In a written opinion issued on February 28, 1991, the Board briefly reiterated the reasons for the reimbursement denial. The Board also reviewed the division of authority between IEPA and the OSFM regarding the UST statutory scheme, stating that OSFM's role is limited to the precorrective stage after which IEPA becomes the lead State agency. The Board concluded that while the OSFM may adopt a regulation defining UST for UST registration purposes, the IEPA is not bound by the definition. Instead, IEPA must adhere to the Environmental Protection Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1001 *et seq.*) and regulations adopted thereunder when processing an application for reimbursement from the UST Fund. Rockford made a timely appeal.

■ We begin our analysis by noting that this court will uphold a quasi-judicial act of the Board unless it is contrary to the manifest weight of the evidence. (*Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 402; see *Waste Management of Illinois, Inc. v. Pollution Control Board* (1988), 175 Ill. App. 3d 1023, 1030.) However, our deference to the Board is muted somewhat since this case will turn on statutory interpretation. "[T]he interpretation placed on a statute by the agency charged with its administration

and enforcement, while not binding [citation], is generally accorded deference by the courts." *City of Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345.

Rockford first contends that the plain language of section 22.18b of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.18b), which governs disbursements from the UST Fund, compels reversal of the reimbursement denial. Alternatively, Rockford argues that if there is a true conflict between the OSFM and IEPA definitions of a UST, then the company should be reimbursed from the UST Fund under principles of fundamental fairness. The State argues that the Board and IEPA properly denied Rockford reimbursement because, at the time of Rockford's application, the tanks did not fall within the Act's definition of a UST.

At the outset, we take notice of the complexity of the UST statutory scheme and are reminded of the words of Judge Learned Hand, written over 40 years ago:

"Much of the law is now *** difficult to fathom, and more and more of it is likely to be so; for there is little doubt that we are entering a period of increasingly detailed regulation, and it will be the duty of judges to tread the path—for path there is — through these fantastic labyrinths." Hand, "Thomas Walter Swan," 57 Yale L.J. 167, 169 (1947).

■ Rockford contends that the starting point for analysis of this appeal is section 22.18b(a) of the Act, which states:

"(a) An owner or operator is eligible to receive money from the Underground Storage Tank Fund for costs of corrective action or indemnification only if all of the following requirements are satisfied:

(1) Neither the owner nor operator of the underground storage tank is the United States Government;

(2) The underground storage tank does not contain fuel which is exempt from the provisions of Section 2a of The Motor Fuel Tax Law [Ill. Rev. Stat. 1989, ch. 120, par. 418a];

(3) The costs of corrective action or indemnification were incurred by an owner or operator as a result of a release of petroleum, but not including any hazardous substance, from an underground storage tank;

(4) The owner or operator has registered the tank in accordance with Section 4 of 'An Act to regulate the storage, transportation, sale and use of gasoline, volatile oils and other regulated substances', approved June 28, 1919 [Ill. Rev. Stat. 1989, ch. 127½, par. 156], and paid into the Un-

derground Storage Tank Fund all fees required for the tank in accordance with Sections 4 and 5 of such Act [Ill. Rev. Stat. 1989, ch. 127½, par. 157] and regulations adopted by the Office of State Fire Marshal;

    (5) For costs of indemnification, in addition to items (1) through (4), the provisions of subsection (e) have been met." (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.18b(a).)

Rockford argues that it satisfied all the requirements listed in section 22.18b(a) and is thus "eligible to receive money" from the UST Fund. We, however, believe the proper starting point for analysis is to determine which definition applies to the phrase "underground storage tank" as it is used in that section, that of the OSFM or IEPA. This is the crucial inquiry because Rockford has conceded that its tanks would not fall within the IEPA definition of a UST that was in effect at the time of Rockford's application for reimbursement.

    ■ Saving equity considerations for later, we note that section 22.12(a) of the Act provides that "[t]he [IEPA] *shall* act as the lead agency in the formulation of regulations and policies" concerning the UST program. (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.12(a).) As we noted earlier, section 22.18(e)(1)(A) defines UST by referencing RCRA (42 U.S.C.A. §6901 *et seq.* (West Supp. 1983)). RCRA in turn defines UST as excluding any "tank used for storing heating oil for consumptive use on the premises where stored." (42 U.S.C.A. §6991(1)(b) (West Supp. 1991).) We believe that it would be illogical for IEPA to apply a UST definition drawn from OSFM regulations, when the phrase is plainly defined by statute in section 22.18(e)(1)(A) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.18(e)(1)(A)), two sections prior to the reimbursement section. We are equally puzzled by the fact that section 4(e)(1) of the OSFM statute (Ill. Rev. Stat. 1989, ch. 127½, par. 156(e)(1)) is *identical* to that of section 22.18(e)(1)(A) of the Act, which we believe draws into serious question the validity of the contrary OSFM regulations (41 Ill. Adm. Code §§170.400(jj)(1)(B), 171.71(d) (1989)). We hold that the phrase "UST" in section 22.18b of the Act is defined by section 22.18(e)(1)(A) of the Act and that IEPA and the Board properly interpreted the statute to deny Rockford reimbursement from the Fund.

    Rockford argues in the alternative that this court should reverse the Board under equitable principles of fundamental fairness. We sympathize with the labyrinth of UST rules and regulations that Rockford faced. We note the promises of UST Fund coverage by the OSFM in 1986. We further note that Rockford would, most likely, have received reimbursement had Rockford filed its application with IEPA on or af-

ter July 11, 1990, when the amendments to the Act and the OSFM statutes took effect, rather than in October 1989.

However, we find no compelling reason for this court to invoke its equitable powers and order that Rockford be reimbursed from the UST Fund. A court may not simply dispense with the plain requirements of a statute by drawing on its equitable powers. (*First Federal Savings & Loan Association v. Walker* (1982), 91 Ill. 2d 218, 227.) We believe that the statutory definition of UST in effect when Rockford applied for reimbursement is clear and unambiguous, notwithstanding the affirmations made to Rockford in 1986 by the OSFM which were based on OSFM regulations. Sections in both the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.18(e)(1)(A)) and the OSFM statute (Ill. Rev. Stat. 1989, ch. 127½, par. 156(e)(1)) define UST by referencing RCRA (42 U.S.C.A. §6901 *et seq.* (West 1983)). We find no fundamental unfairness in the fact that Rockford's tanks, along with similarly situated tanks, fell within the exclusion in the RCRA definition. 42 U.S.C.A. §6991(1)(b) (West Supp. 1991).

We further note that the legislature chose not to make the amendments that took effect July 11, 1990, retroactive in nature. A statutory amendment cannot be given retroactive effect in the absence of a clear expression of legislative intent to do so. (*Rivard v. Chicago Fire Fighters Union, Local No. 2* (1988), 122 Ill. 2d 303, 309.) In addition, a material change in the language of the statute creates a presumption that the amendment was intended to change the law. (*State of Illinois v. Mikusch* (1990), 138 Ill. 2d 242, 252; see 1A N. Singer, Sutherland on Statutory Construction §22.30, at 265 (Sands 4th ed. 1985).) Therefore, we agree with the State's argument that the amendments show a legislative intent to change the statutory definition of UST to include tanks such as Rockford's effective July 11, 1990.

■ Within its request for equitable relief, Rockford contends that it has been the "victim of a taking." Rockford argues that it paid a UST registration fee, $100 for each of 10 tanks, into the UST Fund in 1986 and is now being denied coverage from the Fund. Rockford's argument is based on the "takings" clause of the Illinois Constitution, which provides:

> "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." (Ill. Const. 1970, art. I, §15.)

Rockford cites *Citizens Utility Co. v. Metropolitan Sanitary District of Greater Chicago* (1974), 25 Ill. App. 3d 252, as its only authority in support of its takings argument. We fail to see how *Citizens Utility*

supports Rockford's argument since the court there reversed a finding by the trial court that a private utility company had been the victim of a taking by the government. *Citizens Utility,* 25 Ill. App. 3d at 259.

Furthermore, we believe that the UST statutory scheme indicates that the OSFM is responsible for collecting registration fees and that the fees are deposited into the UST Fund (Ill. Rev. Stat. 1989, ch. 127½, par. 157(a)). While the primary intended use of the Fund is to provide money for the cleanup of UST leaks, money from the Fund may also be used by IEPA, the OSFM and the Department of Revenue for administrative costs associated with the UST program. (Ill. Rev. Stat. 1989, ch. 111½, par. 1022.13.) In this particular case, we therefore view the registration fee that Rockford paid into the UST Fund as being similar to an automobile owner paying a fee to register his car with the State or his locality, rather than being an insurance premium entitling the payor to coverage as Rockford argues. We therefore conclude that Rockford has not been the victim of a taking by the government.

For the above reasons, we affirm the decision of the Pollution Control Board.

Affirmed.

GEIGER and BOWMAN, JJ., concur.