THE TOWNSHIP OF HARLEM, Petitioner-Appellant, v. THE ENVIRONMENTAL PROTECTION AGENCY *et al.*, Respondents-Appellees.

Second District   No. 2—93—0142

Opinion filed July 22, 1994.

James P. DeNardo, Gregory L. Cochran, Christine L. Olson, and Michael J. Maher, all of McKenna, Storer, Rowe, White & Farrug, of Chicago, for petitioner.

Roland W. Burris, Attorney General, and Dorothy M. Gunn, of Pollution Control Board, both of Chicago (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of counsel), for respondents.

JUSTICE PECCARELLI delivered the opinion of the court:

Harlem Township (Harlem or the township) petitions for review of the order of the Pollution Control Board (the Board) which denied reimbursement from the underground storage tank fund for the cost of cleaning up a petroleum spill. Harlem contends that the Board erred in determining that the nozzle from which the gasoline spilled was not part of an underground storage tank system.

The relevant facts are not in dispute. Harlem's employee, Charles Brockman, reported for work on April 22, 1991, and noticed that fuel had spilled from a pump on the premises over the weekend. The pump was connected to an underground storage tank (UST). Brockman noticed that the front gate was open and the shop door was unlocked. There was a puddle by the fuel pump, and the nozzle was lying on the ground unlocked. No gas was coming from the nozzle because the pump had "burned out." Brockman had locked the shop door when he left work on Friday evening.

Harlem suspected vandalism and filed a police report, but the perpetrators were never caught. Approximately 450 gallons of gasoline were released from the pump. Harlem paid Rockford Blacktop $68,367.24 to clean up the spill.

Harlem filed an application for reimbursement from the underground storage tank fund (the fund). (See 415 ILCS 5/22.18 (West 1992).) The Environmental Protection Agency (the Agency) denied the request. Harlem petitioned for review by the Board. Following a hearing, the Board upheld the agency's determination. The Board found that the pump and nozzle from which the fuel spilled were not part of an "underground storage tank system" within the meaning of the statute.

Harlem filed a petition for reconsideration, which the Board denied. Harlem then petitioned directly to this court for review of the Board's order. See 415 ILCS 5/41(a) (West 1992).

Harlem contends that the Board improperly denied it reimbursement from the fund. Harlem maintains that the release from the pump nozzle was a release from an underground storage tank system within the meaning of the statute. Harlem presents several related

arguments based on statutory construction and public policy. The Board responds that its interpretation is consistent with the purpose of the statute creating the fund.

●1 To minimize the adverse effects on the environment caused by the handling, storage and disposal of petroleum, the legislature created a system to register underground storage tanks and provide a State fund from which owners and operators can be reimbursed for the cost of corrective action incurred as the result of a release of petroleum from an underground storage tank. (415 ILCS 5/22.18, 22.18b (West 1992).) The statute adopted the definition of "underground storage tank" contained in Federal environmental statutes. The statutes define an "underground storage tank" as "any one or combination of tanks (including underground pipes connected thereto) which is used to contain an accumulation of regulated substances, and the volume of which (including the volume of the underground pipes connected thereto) is 10 per centum or more beneath the surface of the ground." (415 ILCS 5/22.18(e)(1)(A) (West 1992); 42 U.S.C. § 6991(1) (1988).) The definition is subject to several exceptions not relevant here. The Board has promulgated regulations regarding underground storage tanks which define "underground storage tank system" as including the tank, connected underground piping, underground ancillary equipment, and a containment system, if any. 35 Ill. Adm. Code § 731.112 (1991).

In substance, the statute provides that owners and operators of underground storage tanks must register them with the State and pay a registration fee. (415 ILCS 5/22.18(b)(1)(B) (West 1992).) The fees are deposited in the underground storage tank fund. (415 ILCS 5/22.13(a) (West 1992).) An owner or operator may apply to the fund for reimbursement for costs associated with "a release of petroleum from an underground storage tank." 415 ILCS 5/22.13(b) (West 1992).

The Agency and the Board denied Harlem's application on the basis that the release through a pump nozzle located above ground was not a release from an underground storage tank or underground storage tank system as defined by the relevant statutes and regulations. Harlem protests that this is an unduly restrictive interpretation of the statute. Harlem contends that the statute should be construed broadly to effectuate its remedial purpose. It notes that the potential for environmental damage caused by petroleum releases is the same whether the petroleum escapes directly from an underground tank into the soil or through a pump nozzle on the surface. Harlem contends that in either case the spilled fuel comes "*from* an underground storage tank."

The Board responds that its interpretation is reasonable in light of the purpose of the statute. It contends that the statute has a narrow purpose, to alleviate damage caused by leakage from underground tanks, and that the statute should therefore be construed narrowly.

In this case, we are once again called upon to enter the " 'fantastic labyrinths' " of the UST statutory scheme. (*Rockford Drop Forge Co. v. Pollution Control Board* (1991), 221 Ill. App. 3d 505, 510, quoting Hand, "Thomas Walter Swan," 57 Yale L.J. 167, 169 (1947).) In this, we are guided by well-established principles regarding the respective roles of administrative agencies and the courts. The review of an administrative agency decision extends to all questions of law and of fact presented by the record. The agency's findings of fact are considered to be *prima facie* true and correct. (*Strube v. Pollution Control Board* (1993), 242 Ill. App. 3d 822, 826.) The agency's determinations of questions of law are not entitled to the same deference as its findings of fact. Nonetheless, a reviewing court should afford substantial deference to the agency's interpretation of a statute which the agency administers and enforces. *Strube*, 242 Ill. App. 3d at 826-27; *Rockford Drop Forge Co.*, 221 Ill. App. 3d at 509-10.

The UST fund is part of a joint Federal-State program to alleviate environmental damage caused by leaking underground storage tanks. On appeal, both parties cite to the findings and comments of the United States Environmental Protection Agency (EPA) in conjunction with the promulgation of regulations under the Federal program. These comments make clear that the EPA's primary concern was leaking underground storage tanks. The Federal agency noted that many aging tanks have begun to leak, but that the leaks often go undetected unless someone sees or smells the release. The agency found that only about 10% of reported release incidents were discovered through inventory controls or mechanical monitoring systems. 53 Fed. Reg. 37088 (1988).

Harlem points out that the EPA also considered releases caused by spills and overfills during the course of filling the tanks from a hose connected to a truck. Harlem contends that that situation is analogous to the instant case, where the spill occurred by pouring fuel out of the tank through a hose.

We believe the Board's interpretation is a reasonable one, consistent with the purpose of the statute. The UST program was designed to alleviate environmental damage caused by leaking underground storage tanks. By nature, such leaks are difficult to spot and often difficult to prevent. Once a tank is placed in the ground, the owner has little practical control over it. By contrast, pumps and nozzles are located above ground and are subject to the owner's control. It is

reasonable to place the burden of cleaning up such spills on the owner or operator, who is able to take preventive measures. In this case, for example, better security at Harlem's garage might have prevented the incident.

●2 Contrary to Harlem's contention, the purpose of the UST program will not be frustrated by excluding coverage for spills from above-ground pump handles. Such spills, while numerous, are usually small and, as noted, can be readily detected and cleaned up quickly. Moreover, as the Board notes, expanding coverage as Harlem suggests might actually frustrate the program's purpose. Including spills from above-ground pumps and nozzles would subject the fund to a potentially limitless new class of claims. The fund, of course, has limited resources, and the statute provides that claims may not be paid if there are insufficient funds in the account. (415 ILCS 5/22.18b(d) (West 1992).) Requiring payment from the fund for claims such as that at issue might well deplete the fund, leaving insufficient money available to pay for the cleanup of far more serious problems.

We are also unconvinced that references to spills resulting from the filling of the tank require a different result. In the preamble to its proposed regulations, the EPA briefly mentioned such "spills and overfills," noting that such incidents are the most common type of release. However, the EPA also noted the small volume of fuel typically released in this type of spill. 53 Fed. Reg. 37090 (1988).

Harlem suggests that spills and overfills are analogous to the present situation, where the fuel was spilled in the course of being emptied from the tank. We cannot agree. As the Board notes, a spill from a gas pump is simply not a spill from an underground storage tank. The regulatory definition of a UST system does not include above-ground dispensing devices such as pumps and nozzles. (35 Ill. Adm. Code § 731.112 (1991).) Moreover, the EPA apparently included spills and overfills in the Federal program because of concern about the corrosive effect of the spilled fuel on the tanks themselves. (See 53 Fed. Reg. 37090 (1988).) Harlem has not demonstrated that similar concerns are present where, as here, the fuel is released from a pump nozzle remote from the tank itself. Finally, it is significant that the EPA, while discussing spills and overfills in the course of filling the tank, did not mention at all the supposedly analogous situation of spills of fuel coming out of the tank. These considerations lead us to conclude that spills from a pump nozzle were not intended to be included in the statutory scheme.

Finally, Harlem contends that the Board's decision is inconsistent with its decision in *Sparkling Spring Mineral Water Co. v.*

*Illinois Environmental Protection Agency* (May 9, 1991), PCB 91—1. In *Sparkling Spring*, spillage occurred both while the tank was being filled and while Sparkling Spring was filling its own delivery trucks from the tank. The issue in that case was whether a $50,000 deductible applied to Sparkling Spring's request for reimbursement. Specifically, the question was whether Sparkling Spring had knowledge of the spills prior to July 28, 1989. The Board sti ,ed that "Sparkling may not have understood that *** the overflow and spilling constituted a release as defined by the Act." (*Sparkling Spring*, slip o;o. at 5.) In determining the applicability of the deductible, the Board seems to have assumed that both types of spills constituted releases under the Act. There is no indication in the opinion that that question was specifically addressed, however.

The Board is charged with administering the UST fund for the benefit of all the people of the State. Under the circumstances, it should not be bound by what is essentially *dicta* in a prior case. To do so would unnecessarily hamper the Board in its administration of the program.

For the foregoing reasons, the Pollution Control Board's order is affirmed.

Affirmed.

McLAREN and DOYLE, JJ., concur.