# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Metropolitan Alliance of Police, River Valley Detention Center, Chapter 228 v. Illinois Labor Relations Board*, 2013 IL App (3d) 120308

---

| | |
|---|---|
| Appellate Court Caption | METROPOLITAN ALLIANCE OF POLICE, RIVER VALLEY DETENTION CENTER, CHAPTER 228, Petitioner, v. ILLINOIS LABOR RELATIONS BOARD; RIVER VALLEY JUVENILE DETENTION CENTER; and GERALD KINNEY, Chief Judge of the Twelfth Judicial Circuit, Respondents. |
| District & No. | Third District<br>Docket No. 3-12-0308 |
| Filed | November 8, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of the unfair labor practice charge filed by employees of a juvenile detention center based on the rejection of their request for interest arbitration in the labor negotiations arising from their attempt to replace their existing collective bargaining agreement was upheld on appeal, since the employees worked at a juvenile detention center, not a correctional facility, they were not security employees, they were not entitled to interest arbitration, and the rejection of their request for interest arbitration was not an unfair labor practice. |
| Decision Under Review | Petition for review of order of Illinois Labor Relations Board, State Panel, No. S-CA-11-055. |
| Judgment | Confirmed. |

Counsel on
Appeal

Joseph R. Mazzone (argued), of Joliet, for petitioner.

Lisa Madigan, Attorney General, of Chicago (Valerie Quinn (argued) and Evan Siegal, Assistant Attorneys General, of counsel), for respondent Illinois Labor Relations Board.

Amber L. Stefankiewicz and Mark W. Bennett (argued), both of Laner Muchin Dombrow Becker Levin & Tominberg, of Chicago, for respondent Gerald Kinney.

Panel

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justices Carter and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1        Petitioner Metropolitan Alliance of Police, River Valley Detention Center, Chapter 228 (MAP), brought this petition for review of the dismissal of its unfair labor practice charge against respondents, the Illinois Labor Relations Board (ILRB), the River Valley Juvenile Detention Center (Center) and Gerald Kinney, Chief Judge of the Twelfth Judicial Circuit, by an ILRB administrative law judge (ALJ), and affirmance of the dismissal by the ILRB. We affirm.

¶ 2                                      FACTS

¶ 3        Petitioner MAP is a union comprised of employees at the detention center, including shift supervisors and nonline supervisors. The bargaining unit engaged in labor negotiations with respondent River Valley Juvenile Detention Center (RVJDC or Center) to reach a collective bargaining agreement (CBA) to replace the agreement that expired in 2009. After a failed mediation, MAP filed a demand for compulsory interest arbitration. Respondent Chief Judge Kinney rejected MAP's request for interest arbitration and MAP thereafter filed an unfair labor practice charge against the Center and Kinney. In the charge, MAP alleged that the Center and Kinney violated sections 10(a)(1) and (a)(4) of the Illinois Public Labor Relations Act. 5 ILCS 315/10(a)(1), (4) (West 2010) (unfair labor practice for an employer to interfere with union employees or activities and "to refuse to bargain collectively in good faith").

¶ 4        Respondent ILRB issued a complaint for hearing. The Center and Kinney answered the complaint and denied that the employees were "security employees" entitled to interest arbitration. Both parties filed prehearing memoranda and submitted a joint statement of uncontested facts. The uncontested facts are as follows. The Center is a public employer;

MAP is a labor organization; MAP is the exclusive representative of the shift and nonline supervisors at RVJDC; the MAP unit was certified in 2005; the parties' CBA expired in November 2009; the parties have been negotiating a successor agreement since November 2009; MAP filed a demand for compulsory interest arbitration in September 2010; and Kinney refused the arbitration request on the basis that the bargaining unit was not entitled to interest arbitration.

¶ 5        A hearing took place before the administrative law judge. MAP elected to stand on its documentary evidence consisting of its brief and exhibits. The exhibits included, in part, employee job descriptions; offense and detention statistics; various forms, brochures, handbooks, policy manuals and website content from the Center; information regarding the Will County adult detention facility; and juvenile corrections and detention standards. The statistics revealed that the average population of the Center was 54 juveniles, with an average stay of 23 days, according to a fiscal year 2009-10 report. In 2010, the average daily population was 44, with 711 admissions. In the period from January 2009 to June 2011, juveniles were detained in a range from 763 days for a first degree murder charge to 1 day for a contempt of court charge.

¶ 6        Thaddeus Zito testified for the Center and Kinney. He is the assistant superintendent of the Center and employed by the chief judge of the Twelfth Judicial Circuit. The Center is under the auspices of the Illinois Department of Juvenile Justice (IDJJ) and is not governed by the Illinois Department of Corrections (IDOC). In 2006, the IDOC Juvenile Division was abolished and the IDJJ was created. 730 ILCS 5/3-2.5-1 *et seq.* (West 2010). The Center still uses the IDOC standards because new ones have not been implemented for the IDJJ but the residents are not in IDOC custody. The Center houses both males and females, generally ages 10 to 16, with some limited statutory age exceptions. There are two ways residents are detained at the Center. The first way is from a referral by an arresting officer or department. The juveniles are evaluated by Center staff who determine whether they should be admitted. If approved for admittance, the juvenile is thereafter given a detention hearing where the trial court decides if there is probable cause that the juvenile is delinquent. The other means is through court order. The "vast majority" of residents have not been adjudicated but are awaiting disposition of their cases and are not there for a determinate period.

¶ 7        The shift supervisors maintain the secured part of the Center; supervise the juvenile detention officers, who interact with the Center's juveniles; schedule the staff; check in visitors; and provide programs when needed. The nonline supervisors include the court liaison, the programs manager, the training supervisor, and the technical coordinator. The shift and nonline supervisors are management personnel required to meet the minimum standards established by the Illinois Supreme Court as set forth in the definition of probation officer in the Probation and Probation Officers Act (Probation Act) (730 ILCS 110/9b(3) (West 2010)). Employment appointments are made pursuant to section 15 of the Probation Act. 730 ILCS 110/15 (West 2010) (Illinois Supreme Court authorized to establish probation services). The juvenile detention officers, who are hired by Will County court services, monitor the health, safety and welfare of the residents; oversee the juveniles' daily activities; and attend to the emotional needs of the juveniles. Per the recommendation of the Administrative Office of the Illinois Courts (AOIC), the Center maintains an 8-to-1 ratio of

juveniles to staff. The Center is under the AOIC's probation and court services division, which sets standards for the juvenile detention facilities.

¶ 8        John Prinzi testified. He is the superintendent of the Center, responsible for the day-to-day operations and is employed by the chief judge of the Twelfth Judicial Circuit. Juvenile detention is under the oversight of the AOIC, whose mission, in part, is to "improve and enhance the probation court services field." He submits the Center's annual plan to the AOIC, including a budget. The AOIC provides the Center's funding, in part, and the Center must report its expenditures to the AOIC. The AOIC promulgates standards for hiring and jobseekers must complete an AOIC application and be found AOIC-eligible prior to being hired by the chief judge. The AOIC sets salary schedules, as well as compensation criteria and standards. The Center is accredited through the American Correctional Association, which provides auditing and oversight for juvenile detention facilities, in addition to correctional facilities. The IDOC does not provide any funding for the Center.

¶ 9        MAP called rebuttal witnesses. John Hall testified that he is a shift supervisor at the Center. The Center is designed for direct supervision, similar to the design at the Will County Adult Detention Center (ADC). Bret Jerkatis, the Center's technical coordinator, testified. He was a member of the transition team involved in the design of the Center. It was modeled off the adult detention center.

¶ 10       The parties filed posthearing briefs wherein they presented their legal arguments. MAP asserted that the Center is a correctional facility and that the shift and nonline supervisors are not probation officers. In response, the Center and Kinney argued that the Center is not a correctional facility and the employees are probation officers and not security employees entitled to interest arbitration. The ALJ found that the juveniles at the Center were inmates under the supervision and control of the shift supervisors, who oversee the juvenile detention officers (JDOs). The ALJ further found that the Center was not a correctional facility, and accordingly, the supervisors were not security employees entitled to interest arbitration. The ALJ recommended dismissal of MAP's unfair labor practice charge. Both parties filed exceptions to the ALJ's recommended decision and order. The ILRB adopted and affirmed the ALJ's order. MAP appealed.

¶ 11                                        ANALYSIS

¶ 12       The issue on appeal is whether the ILRB erred when it affirmed the ALJ's dismissal of MAP's unfair labor practice charge. MAP argues that the ALJ and ILRB improperly found that the Center's supervisors were not security employees entitled to interest arbitration because they did not work in a "correctional facilit[y]." It complains that the ALJ and ILRB failed to give the definition of "correctional facilities" its plain and ordinary meaning and that their failure to do so renders an absurd result.

¶ 13       The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Balmoral Racing Club, Inc. v. Topinka*, 334 Ill. App. 3d 454, 458 (2002) (citing *People v. Maggette*, 195 Ill. 2d 336, 348 (2001)). The best indicator of legislative intent is the statutory language, which is to be given its plain and ordinary meaning. *Balmoral Racing Club, Inc.*, 334 Ill. App. 3d at 459. A dictionary may be used as an aid in

determining the ordinary meaning. *Bailey v. Illinois Liquor Control Comm'n*, 405 Ill. App. 3d 550, 555 (2010) (citing *Cojeunaze Nursing Center v. Lumpkin*, 260 Ill. App. 3d 1024, 1029 (1994)). However, statutory definitions control when construing a statute and common law definitions yield to statutory definitions. *People v. Perry*, 224 Ill. 2d 312, 326-27 (2007) (citing 34 Ill. L. and Prac. *Statutes* § 51 (2001)). On review of an ILRB decision, we accord deference to the Board's reasonable interpretation of a statute it is charged with enforcing. *Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989). We review *de novo* an agency determination on issues of statutory interpretation. *Mingus v. Board of Trustees of the Police Pension Fund*, 2011 IL App (3d) 110098, ¶ 10.

¶ 14    The Illinois Public Labor Relations Act (Act) prohibits "security employees" from striking but provides them the right to interest arbitration. 5 ILCS 315/14(m), (a) (West 2010). The Act defines a security employee as "an employee who is responsible for the supervision and control of inmates at correctional facilities." 5 ILCS 315/3(p) (West 2010). The Unified Code of Corrections defines "correctional facility" as "any building or part of a building where committed persons are kept in a secured manner." 730 ILCS 5/3-1-2(d) (West 2010). A committed person is a person committed to the Department of Corrections. 730 ILCS 5/3-1-2(c) (West 2010). Commitment is "a judicially determined placement in the custody of the Department of Corrections on the basis of delinquency or conviction." 730 ILCS 5/3-1-2(b) (West 2010).

¶ 15    The Juvenile Court Act of 1987 defines detention as "the temporary care of a minor who is alleged to be or has been adjudicated delinquent and who requires secure custody for the minor's own protection or the community's protection in a facility designed to physically restrict the minor's movements, pending disposition by the court or execution of an order of the court for placement or commitment." 705 ILCS 405/5-105(5) (West 2010).

¶ 16    The Probation Act defines a probation officer as:

"a person employed full time in a probation or court services department providing services to a court under this Act or the Juvenile Court Act of 1987 [(705 ILCS 405/1-1 *et seq.*)]. A probation officer includes detention staff *** who meet minimum standards established by the Supreme Court and who are hired under the direction of the circuit court. These probation officers are judicial employees designated on a circuit wide or county basis and compensated by the appropriate county board or boards." 730 ILCS 110/9b(3) (West 2010).

¶ 17    The Illinois Labor Relations Act does not define "correctional facilities." MAP urges this court to adopt a definition of "correctional facility" it found online at uslegal.com and find that RVJDC is a correctional facility, its supervisors are security employees, and the MAP unit is entitled to interest arbitration. MAP's proffered definition of "correctional facility" is as follows:

"Correctional facility is a term that may be used to refer to a jail, prison, or other place of incarceration by government officials. They serve to confine and rehabilitate prisoners and may be classified as minimum, medium, or maximum security facilities, or contain separate divisions for such categories of prisoners. The prisoners may participate in educational and vocational programs as well as in paid industries programs

-5-

or a work release program." US Legal, http://definitions.uslegal.com/c/correctional-facility/ (last visited Oct. 4, 2013).

¶ 18    In arguing that the Center is a correctional facility, MAP relies extensively, in addition to the above definition, on aligning the layout and furnishing of the Center, its procedures and practices, and the nature of the juveniles detained there with the Will County Adult Detention Center. MAP's comparison does not aid its position. Even if we were to find MAP's comparison with the adult detention center appropriate, and we do not, MAP has not introduced any evidence that the adult detention center and its supervisors are employed in a correctional facility as security employees entitled to interest arbitration. Moreover, we agree with the ALJ's decision to look to Illinois statutory definitions of "correctional facilities" instead of a general online definition chosen by MAP.

¶ 19    The ALJ noted that the Board had not yet addressed what constitutes a correctional facility and whether a juvenile detention center qualifies as one. The ALJ looked to two other administrative decisions in rendering the decision. *Chief Judge of the Fifth Judicial Circuit*, 18 PERI ¶ 2057 (ILRB State Panel 2002) (finding juvenile detention centers to be correctional facilities because they deprive juveniles of liberty and conform to IDOC standards); *International Brotherhood of Teamsters, Local 330*, 18 PERI ¶ 2026 (ILRB State Panel 2002) (finding juvenile detention centers are not correctional facilities because the juveniles are detained there and not committed, and the legislature expressly delineated "detention facilities" from "correctional facilities"). The ALJ relied on the distinction found in *Teamsters, Local 330*, distinguishing committed juveniles from detained juveniles and statutory support for the distinction in reaching her decision.

¶ 20    We consider the ALJ's reasoning and conclusion correct. We reject MAP's proffered definition and instead look to the statutory framework to discern the legislative intent as an aid in defining "correctional facilities" under the Act. The Juvenile Court Act provides that a juvenile is detained when he or she is alleged or adjudicated delinquent and requires secure custody in a restricted facility pending court disposition or execution of a court order for placement or commitment. 705 ILCS 405/5-105(5) (West 2010). In contrast, under the Unified Code of Corrections, a correctional facility houses committed persons placed in the custody of the IDOC by a judicial determination based on delinquency or conviction. 730 ILCS 5/3-1-2(b), (c), (d) (West 2010).

¶ 21    As concluded by the ALJ, the nature of confinement is the critical distinction between the Center and a correctional facility. The residents who are detained at the Center are awaiting adjudication and have not yet been found delinquent or sentenced to a term of incarceration. They are detained under a detention order, not an order of commitment. Testimony at the hearing established there had been no such commitments in the witness's 13-year tenure at the Center and MAP did not present any evidence that committed juveniles have ever been held at the Center except those juveniles that are awaiting transfer to a specific type of treatment facility pursuant to a court order. Statistics submitted by MAP indicate that between June 2007 and June 2011, the Center's population ranged from 19 to 84 juveniles. In fiscal year 2009-10, the average population was 54 and the average stay at the Center was 23 days. Days in detention pending trial ranged from 763 days for a first degree murder charge to 1 day for a contempt of court charge. The statistics offered by MAP

did not include any information that juveniles had been sentenced to serve a term at the Center after being adjudicated delinquent.

¶ 22    We are further persuaded that the sweeping changes the legislature made to the nature of incarcerating juveniles when it created the Department of Juvenile Justice supports our determination. See 730 ILCS 5/3-2.5-5 (West 2010) ("purpose of this Article is to create the Department of Juvenile Justice" and directing the IDJJ to "embrace the legislative policy of the State to promote the philosophy of balanced and restorative justice" as set forth in the Juvenile Court Act of 1987 (705 ILCS 405/5-101 (West 2010)). The creation of the IDJJ separated juvenile justice from the IDOC, which is not involved in the operation of the Center. The juveniles detained at the Center are not in IDOC custody. Although the Center operates under IDOC standards because no other standards are in place, it is accredited as a detention center, not a juvenile correctional facility. At the Center, the supervisors in the MAP unit direct the juvenile detention officers, who are generally responsible for the safety, security and supervision of the residents. Contrary to MAP's assertions, the JDOs serve as advocates and counselors, not as correctional officers. See 730 ILCS 5/3-2.5-40.1 (West 2010) (detention center staff to be trained "to work with a broad range of youth and possess the skills necessary to assess, engage, educate, and intervene with youth in its custody in ways that are appropriate to ensure successful outcomes for those youths"). The distinction between a detention center and a correctional facility is additionally supported by the Probation Act, which identifies detention staff, but not correctional staff, as probation officers. 730 ILCS 110/9b(3) (West 2010). See also 705 ILCS 405/1-4.1 (West 2010) (distinguishing between detention center and secure correctional facility).

¶ 23    Detention staff are required to meet AOIC standards and are employed by the probation or court services department. 730 ILCS 110/9b(3) (West 2010). Further distinguishing the Center from a correctional facility is that it is funded and operated by the AOIC and the Will County chief judge. 705 ILCS 405/6-6 (West 2010). The AOIC requires applicants for positions at the Center to pass its eligibility standards, after which the chief judge hires the Center's employees under the circuit's probation and court services department. Had the legislature intended the staff at juvenile detention homes to be considered correctional officers and the detention homes to be correctional facilities, it would have done so. Instead, the legislature expressly differentiated between detention homes and correctional facilities.

¶ 24    Because the supervisors here do not work at a correctional facility, they do not meet the definition of security employees and are not entitled to interest arbitration. There was no unfair labor practice in Chief Judge Kinney's refusal to proceed with interest arbitration. Accordingly, we find that MAP's unfair labor practice charge was properly dismissed.

¶ 25    For the foregoing reasons, the judgment of the Illinois Labor Relations Board is confirmed.

¶ 26    Confirmed.