NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180754-U

NO. 4-18-0754

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 10, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TRAVIS KOESTER, | ) | Direct Administrative Review |
| Petitioner, | ) | of Illinois Labor Relations |
| v. | ) | Board, State Panel |
| THE ILLINOIS LABOR RELATIONS BOARD, STATE) | | No. S-CA-16-133 |
| PANEL; SANGAMON COUNTY; and SANGAMON | ) | |
| COUNTY SHERIFF'S OFFICE, | ) | |
| Respondents. | ) | |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The Illinois Labor Relations Board did not err by rejecting petitioner's unfair-labor-practice claim.

¶ 2    Petitioner, Travis Koester, seeks direct administrative review of a decision of the Illinois Labor Relations Board, State Panel (Board), rejecting his unfair-labor-practice claim against respondents, Sangamon County and the Sangamon County Sheriff's Office (Sheriff's Office). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Petitioner worked as a deputy sheriff for respondents and was a member of the Illinois Fraternal Order of Police Labor Council (FOP), the exclusive bargaining representative of respondents' tenured deputies. Beginning in November 2009, he was also a member of the Tactical Response Unit (TRU), a specially trained law enforcement "support resource" within the Sheriff's

Office. The TRU was comprised of deputies and officers from both the Sheriff's Office and other law enforcement agencies and was used to respond to situations of "demonstrated or potential violence [and] force," including, for example, those involving hostages, barricaded gunmen, riots, high-risk warrants, manmade or natural disasters, and terrorist events. TRU membership was voluntary and members could be removed from the TRU at any time. Respondents employed Lieutenant John Hayes as the commander of the TRU. Captain Cheryllynn Williams oversaw the TRU and was Hayes's direct supervisor.

¶ 5        On March 22, 2016, petitioner was removed from the TRU. On May 25, 2016, he filed an unfair-labor-practice charge with the Board, alleging his removal was improper because it was done in retaliation for his filing of a union grievance. He sought reinstatement to the TRU, compensation for lost income, expenses, and attorney fees. On October 21, 2016, the Board issued a complaint for hearing in the matter.

¶ 6        On May 15, 2017, the parties submitted a joint pre-hearing memorandum, identifying the issues of law in the case as (1) whether respondents interfered with, restrained, or coerced public employees in the exercise of their rights in violation of section 10(a)(1) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1) (West 2014)) and (2) whether respondents removed petitioner from the TRU in retaliation for filing grievances. They identified contested facts in the case as whether petitioner's removal from the TRU (1) was because he filed a union grievance, alleging he had been improperly passed over for promotion and (2) constituted retaliation and caused petitioner to sustain lost wages and lost opportunities.

¶ 7        The parties' memorandum also contained a statement of uncontested facts, and the record reflects no dispute between the parties as to the following events. On June 2, 2014, and

February 17, 2016, petitioner filed grievances challenging the promotional process in the Sheriff's Office. On February 18, 2016, TRU members approached Hayes about concerns the TRU team had about petitioner and asked to convene a "team meeting," without the presence of the TRU leadership, to address those concerns. On February 23, 2016, prior to a previously scheduled TRU training session, TRU members held a meeting.

¶ 8        On March 10, 2016, Deputy Derric Miller prepared a memo addressed to Hayes that summarized the meeting. The memo was also signed by Deputy Travis Dalby. In the memo, Miller identified the purpose of the February 23 meeting as being to "communicate some concerns" the team had with petitioner with the "goal" of letting petitioner know how the TRU members felt "in regards to his consistency in filing grievances against fellow deputies and his consistency in utilizing [the Freedom of Information Act (FOIA)] to benefit his cause, whatever that may be."

¶ 9        In his memo, Miller reported that, prior to the February 23 meeting, he and Dalby had been contacted by "numerous [TRU] teammates" who "expressed huge concern over a recent grievance [petitioner] filed against a fellow teammate and an assistant team leader." According to Miller, TRU members felt petitioner was only looking out for his own best interest without consideration for others, they reported having "no trust" in petitioner as a teammate, and they expressed that the lack of trust was a safety concern for the TRU. He stated that after receiving numerous complaints about petitioner, "it was decided the best course of action was to let [petitioner] know how each [team member] felt."

¶ 10        Miller asserted that during the February 23 meeting, TRU members identified "several reasons" why they had no trust in petitioner. He specifically noted that TRU members were

concerned that petitioner had filed grievances against team members and without regard to the effect his grievances could potentially have on others. They were also concerned with petitioner's "use of FOIA for his own personal gain" and that he had acted deceitfully by using his fiancée to make a FOIA request. Finally, Miller stated TRU members were concerned about the way in which petitioner exercised "discretion." Specifically, he stated as follows:

> "Teammates feel [petitioner] has absolutely no discretion when he is working which poses a big problem when much of our job relies on a solid use of discretion. Teammates feel that if policy says [petitioner] can do something[,] then [petitioner] will do it without utilizing discretion on a case by case basis."

¶ 11 Miller reported petitioner appeared "totally blindsided" by the criticism he received and that he became angry and defensive. He further noted as follows:

> "At the conclusion of the meeting, [petitioner] was asked: If you knew then (prior to filing any grievance or submit[ting] any FOIA request) what you know now on how the entire team feels [in] reference [to] your actions, would you still do it again? [Petitioner], without hesitation, replied that yes he would because he has to look out for himself no matter what."

Miller concluded his memo by describing petitioner's actions as selfish and asserting that "[l]ack of trust in an incredibly reactive and dynamic environment [was] extremely dangerous for anyone involved."

¶ 12 On March 18, 2016, Hayes forwarded a memo he prepared to his supervisor, Williams, recommending petitioner's removal from the TRU. He described how the February 23 meeting came about, asserting he had been approached by three deputies about having a TRU peer

meeting to discuss "issues with the actions of [petitioner]." Hayes further asserted as follows:

> "In the time following the meeting, I have met and spoke with every member of the [TRU]. The Deputies I spoke with feel [petitioner] should be removed from the team. The team members believe they can no longer trust [petitioner] in his capacity as a teammate. In short, their perception is [petitioner] will manipulate situations for his own personal gain or agenda regardless of the consequences."

Hayes stated he was attaching a summary of the February 23 meeting prepared by Miller. Additionally, his memo contained the signatures of 16 TRU members, each of whom agreed with the recommendation for petitioner's removal. As stated, on March 22, 2016, petitioner was removed from the TRU.

¶ 13 On May 22, September 14, and October 2, 2017, hearings were held before an Administrative Law Judge (ALJ). The parties presented evidence that included testimony from petitioner; Hayes; Williams; Joseph Roesch, the chief deputy for the Sheriff's Office; and 15 TRU members, including Miller and Dalby.

¶ 14 Witnesses described the TRU as a "close-knit group," and like a "brotherhood" or "family." The team's motto was "Often Tested, Brothers Forever," which some members had tattooed on their body. Testimony established that trust was very important among TRU members because of the dangerous and intense situations the team members often faced. A lack of trust would create safety issues for the team.

¶ 15 Petitioner testified on his own behalf, stating his June 2014 and February 2016 grievances were filed based on his belief that the Sheriff's Office was not complying with its own internal rules regarding promotions, impacting his opportunity for advancement. He admitted that

had he won his grievances, members of the TRU who were promoted could have been adversely affected.

¶ 16     At the February 23 meeting, petitioner learned that TRU members were upset by his most recent grievance. Petitioner estimated that there were 20 TRU members and that 12 members attended the meeting. Hayes was not present at the meeting when TRU members were voicing their concerns to petitioner. Petitioner recalled that Miller and Dalby led the meeting and that Miller expressed that he was upset because petitioner "had filed grievances." According to petitioner, Miller felt petitioner should not "take action against another member of the team that could hurt [the team member]" and that petitioner was "looking out for [himself]." Petitioner stated that Dalby reiterated Miller's concerns about the grievances and referenced petitioner's filing of FOIA requests. Petitioner acknowledged that he had filed several FOIA requests. In connection with those requests, he sought the internal affairs files of other deputies and documents that named one particular deputy in a lawsuit. Petitioner agreed he had once asked his fiancée to file a FOIA request for an internal affairs file on another deputy.

¶ 17     Petitioner testified that at the February 23 meeting, a few other TRU members also spoke up. One member expressed how he would personally be affected by petitioner's recent grievance if it was successful. Petitioner stated the remaining TRU members who voiced complaints reiterated the same points—that they were upset by the grievances and did not know if they could trust petitioner as a result. Petitioner asserted one member questioned why the discussion was being had as it seemed to be "based on an administrative issue and had nothing to do with operational abilities." Petitioner agreed that at the conclusion of the meeting, he maintained he would make the same choice to file a grievance again "because it would benefit [his] family." He stated

he explained to his TRU teammates that he filed grievances because he believed "the contract had been violated" and such violations were harmful to his future. Petitioner also testified that the TRU members did not challenge his job abilities and, instead, expressed that he "was actually very safe and very good *** and very skilled."

¶ 18    On March 21, 2016, petitioner was called into a meeting with Williams and Hayes and told he was being removed from the TRU. On March 25, 2016, he wrote his own memo to clarify for Williams what occurred at the meeting and to express his belief that his removal from the TRU was "direct retaliation for filing a grievance as it was the only point made to [him] for [his] removal from the team and a lack of trust." Petitioner's March 2016 memo was entered into evidence before the ALJ and contained a description of the February 23 meeting that was similar to petitioner's hearing testimony.

¶ 19    As stated, Miller was among the 15 TRU members to testify at the hearings. He stated his "sense" of the TRU members' concerns about petitioner was that the grievances were "a symptom of other things" and petitioner was exhibiting "selfishness." Miller "felt that [petitioner] was utilizing grievances for personal gain, to help himself out, and with total disregard for anybody else that was in his way." In general, the TRU members "were having issues with trusting [petitioner]." The point of the February 23 meeting was to let petitioner know how the team felt and "if he would do anything different that would make [the team] feel different" and regain trust. At the time of the meeting, the TRU members had not decided that they wanted petitioner off the team.

¶ 20    Miller testified that besides the grievances filed by petitioner, other issues discussed at the February 23 meeting included the FOIA request by petitioner's fiancée, and a TRU "call-

out" involving a firearm in an oven. Regarding the latter incident, Miller explained that prior to a raid on a residence, the TRU team was given information that a confidential informant reported a gun was kept in the oven. The TRU members were not supposed to retrieve the gun because it could compromise the identity of the confidential source. However, during the raid, petitioner ordered another deputy, Dave Drabing, to retrieve the gun. Later, when Hayes confronted the team about the mistake in retrieving the gun, Drabing "owned" his part in the mistake but petitioner did not speak up.

¶ 21    Miller testified that at the time of the February 23 meeting, he had also been aware of "numerous lawsuits" involving petitioner and issues involving his excessive use of force. Those situations affected his trust in petitioner and caused him to question whether petitioner properly exercised his "discretion." Miller stated he did not trust petitioner due to his "use of the grievances as a mechanism for self-benefit." He agreed that petitioner was entitled to file grievances and asserted that the grievances in this instance were "an underlying symptom of the overall [trust] problem."

¶ 22    According to Miller, almost everyone at the meeting spoke. After the meeting, the team decided they no longer wanted petitioner on the TRU. Miller believed that the February 23 meeting would have occurred whether or not petitioner had filed his February 2016 grievance. He asserted that the grievance "was the straw that broke the camel's back with the team."

¶ 23    The remaining 14 TRU members also testified they lacked trust in petitioner. They gave reasons for their lack of trust and their desire for petitioner's removal from the TRU team, including (1) the filing of a FOIA request by petitioner's fiancée; (2) petitioner failing to own up to his mistake after the firearm in the oven incident; (3) questions regarding the manner in which

petitioner exercised his discretion as a deputy, which one member who had previously supervised petitioner described as "troubling"; (4) petitioner's responses to his teammates at the February 23 meeting; (5) petitioner's veracity being called into question by others, including the state's attorney's office and a circuit court judge; (6) petitioner's action of documenting his exchanges with others in notebooks; (7) "shady" behavior exhibited by petitioner during the consent search of a residence and when evaluating a suspected impaired driver; (8) petitioner's use of a Taser against a noncombative female subject, resulting in the entry of a summary judgment against him in a federal lawsuit for the excessive use of force; (9) petitioner including false or inaccurate information in police reports; and (10) petitioner ignoring requests from other law enforcement officers.

¶ 24        Most TRU members were explicitly asked whether petitioner's action in filing grievances served as the basis for their lack of trust. One team member, whose promotion was the subject of petitioner's June 2014 grievance, acknowledged that petitioner's grievance affected his trust in petitioner; however, he also cited several other factors that made him question petitioner's integrity and honesty, including incidents when petitioner's veracity was questioned by judges, the firearm in the oven incident, the Taser incident, and an incident when petitioner included false information in a police report. The remaining team members who were specifically asked whether their trust issues with petitioner were based on his grievances denied that the grievances caused their mistrust or that petitioner's filing of grievances was the reason they supported his removal from the team.

¶ 25        Hayes testified that, prior to the February 23 meeting, he "didn't really know" what specific issues the TRU members had with petitioner and, when the meeting was requested, he was not told exactly what the team members intended to discuss. After the meeting, Hayes received

Miller's memo and prepared one of his own directed to Williams. He testified he individually met and spoke with each TRU member, except for two members who were paramedics. He asked each member he spoke with to read his memo and sign their name to the memo if they agreed with its contents. Only one TRU member that Hayes spoke with opted not to sign the memo. The remaining TRU members each told Hayes "it was an issue of trust or veracity and that's why they signed it."

¶ 26　　　　Hayes stated he was aware that petitioner's grievances were mentioned in Miller's post-meeting memo. However, he asserted that "the fact that [petitioner] had filed a grievance had absolutely nothing to do with [his] recommendation" for petitioner's removal from the TRU. Hayes also denied that the reason TRU members lacked trust in petitioner was because he pursued grievances. He testified that the trust issues stemmed from petitioner's cumulative behavior over the years. He stated as follows: "[Petitioner] sees things in a very black-and-white shade. Okay? And that the area that he misses is the gray. Just because you have the ability to do something doesn't mean you should. And that has been taken to the nth degree on a variety of things." Hayes testified petitioner conveyed an attitude of always being right and over the years "created a distrustful relationship[,] socially[,] at work with his co-workers."

¶ 27　　　　Hayes identified the reasons for the TRU team's trust issues that he was aware of when he made his recommendation. Specifically, he noted the firearm in the oven incident, petitioner's FOIA requests, and feelings that petitioner "was not doing what he should on calls" and "taking notes on things [other deputies] did or didn't do." Hayes testified he did not "document" every issue with petitioner in his memo because he did not want "to put dirty laundry on paper when [he could] just go in and talk about it." As examples of undocumented issues, he noted that the state's attorney's office felt petitioner had "serious veracity issues," the summary judgment

- 10 -

entered against petitioner in connection with his use of a Taser, and newspaper articles concerning petitioner.

¶ 28 Hayes also found it significant that each TRU member he spoke with, except for one, signed his memo recommending petitioner's removal without hesitation. He testified that he was also a union member and had filed a grievance in the past. He denied suffering any adverse consequences as a result of his grievance. Ultimately, he recommended petitioner's removal from the TRU because petitioner's "presence on the team was detrimental to the point where it might inhibit [the team's] ability to function" and Hayes did not want "to take that chance."

¶ 29 Williams testified that sometime in February 2016, Hayes reported the TRU members were having "trust issues" with petitioner. Later, Hayes gave her a memo and recommended petitioner's removal from the TRU, an action that required her approval. According to Williams, Hayes said that the TRU members "felt that they couldn't trust [petitioner]." Regarding the reasons for the trust issues, she recalled Hayes describing the incident involving the firearm in the oven. She stated they did not talk about grievances or FOIA requests, but she did read Miller's memo, which contained information about those subjects. Ultimately, Williams agreed with Hayes's recommendation because the TRU had to be a close-knit group and a lack of trust with one person could cause "dissension among ranks." She believed the trust issues were detrimental to the overall functioning of the TRU. Williams testified that petitioner's filing of grievances was not the reason she approved of his removal from the TRU, stating as follows: "It was trust issues. Grievances had no bearing on my decision."

¶ 30 Roesch testified he was the chief deputy with the Sheriff's Office. In the chain of command, he was under the Sheriff, Wes Barr, and above Williams. The ultimate decision to

remove petitioner from the TRU team was his with the advice and consent of the Sheriff. Roesch was aware that there were trust issues with petitioner. He discussed the matter with Williams but did not read the memos prepared by Hayes and Miller. When explaining the situation to the Sheriff, he relayed that almost the entire TRU team expressed that they did not trust petitioner and did not want him on the team. Roesch recommended petitioner's removal from the team to the Sheriff, stating he was also "familiar with a lot of the things that were going on prior." Roesch noted he had personally referred petitioner for disciplinary action in the past. The Sheriff supported the decision for removal.

¶ 31        Roesch testified he determined petitioner had to be removed from the TRU because the team did not trust him and asserted if the "trust isn't there, the team can't function." Roesch was familiar with petitioner's grievances because he dealt with labor issues for the Sheriff's Office. However, he and Williams never discussed the issue of grievances in the context of petitioner's removal from the TRU. Roesch denied that he would have removed petitioner from the TRU for filing grievances, noting that others on the team had also filed grievances.

¶ 32        Roesch believed many of the trust issues with petitioner stemmed from the Taser incident. He testified petitioner's focus was on whether he could do something and not whether he should do something. Roesch identified one of the more serious incidents involving petitioner as when he "made a material misrepresentation" in a police report. He asserted as follows:

> "[Petitioner] did a consent search of a house and he did it, based on his [police] report, based on a Crime Stopper tip. There was no Crime Stopper tip. Because the state's attorney's office was gearing up for trial or charges and they wanted the Crime Stopper tip and there was none."

Roesch believed the incident spoke to petitioner's truthfulness. He stated he "referred" petitioner for discipline based on that incident under the previous administration in the Sheriff's Office. He stated he would have recommended petitioner's termination.

¶ 33      Ultimately, Roesch believed the trust issues with petitioner resulted from behaviors that raised questions regarding petitioner's judgment. Roesch believed there was an erosion of trust with the TRU members over time.

¶ 34      On April 19, 2018, the ALJ issued his recommended decision and order. *Travis Koester, Charging Party, and County of Sangamon and Sheriff of Sangamon County, Respondents*, 35 PERI ¶ 70 (Administrative Law Judge's Recommended Decision and Order, April 19, 2018). He found respondents violated section 10(a)(1) of the Act by removing petitioner from the TRU in retaliation for his grievance filings. *Id.* On May 18, 2018, respondents filed exceptions to the ALJ's decision.

¶ 35      On October 17, 2018, the Board issued its decision, rejecting the ALJ's recommendations and dismissing the complaint for hearing. *Travis Koester, Charging Party, and County of Sangamon and Sheriff of Sangamon County, Respondents*, 35 PERI ¶ 70 (ILRB State Panel, October 17, 2018) (hereinafter 35 PERI ¶ 70). It determined petitioner "failed to establish the requisite causation, *i.e.*, that his filing of the 2014 and 2016 grievances was the substantial or motivating factor in [r]espondents' decision to remove him from the TRU." *Id.* The Board stated as follows:

"We *** find that both the Miller Memo and Hayes Memo show the reason for [petitioner's] removal from the TRU was the TRU members' lack of trust in [petitioner]. Although the filing of grievances was mentioned, the Miller Memo clearly indicates the TRU members were not upset *because* [petitioner] filed grievances,

- 13 -

rather, they were upset that the subject and nature of those grievances demonstrated [petitioner] would only look out for himself at the expense of fellow team members, which they felt was antithetical to the TRU." (Emphasis in original.) *Id.*

¶ 36    This appeal follows.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, petitioner argues the Board erred in rejecting his claim that respondents committed an unfair labor practice. He contends the record shows his removal from the TRU improperly resulted from his filing of a grievance, a protected activity under the Act. Petitioner further asserts the Board's finding that TRU members were upset about "the subject and nature" of his grievances rather than the filing of grievances themselves, was "a semantic distinction of no legal consequence."

¶ 39              A. Petitioner's Compliance with Illinois Supreme Court Rule 341

¶ 40    On appeal, the Board and respondents initially contend petitioner's appellant's brief failed to comply with Illinois Supreme Court Rule 341 (eff. May 25, 2018), warranting forfeiture of his arguments or dismissal of his petition for direct administrative review. They assert petitioner improperly provided an excessively lengthy and argumentative introductory section, made factual assertions with no citation to the appellate record, failed to describe all of the facts necessary to an understanding of the case, and referenced facts for the first time in his argument.

¶ 41    Rule 341 sets forth requirements for the form and content of appellate court briefs. Pursuant to Rule 341(h)(2), an appellant's brief must contain an "introductory paragraph" that generally sets forth the nature of the action and of the judgment appealed from. It should also have a "Statement of Facts," containing "the facts necessary to an understanding of the case, stated

- 14 -

accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal ***." Ill. S. Ct. R. 341(h)(6) (eff. May 25, 2018). Further, an appellant's brief must provide an "Argument" section, which sets forth "the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "The rules of procedure concerning appellate briefs are not mere suggestions, and it is within this court's discretion to strike [a] brief for failing to comply with Supreme Court Rule 341." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045, 904 N.E.2d 1183, 1190 (2009).

¶ 42    Here, as argued by the Board and respondents, petitioner's brief fails to comply with Rule 341. Rather than an "introductory paragraph" describing the nature of the case, petitioner's brief contains a "Statement of the Case" that is in excess of three pages. It sets forth factual information more appropriately reserved for a "Statement of Facts" and improperly contains argument. Petitioner's "Statement of Facts" is deficient in that it provides no factual information about the three-day hearing before the ALJ at which 20 witnesses testified and upon which the Board's ultimate decision was based. It also improperly contains argument and states facts with no citation to the appellate record. Petitioner's "Argument" section is similarly flawed as it also fails to contain appropriate citations to "the pages of the record relied on."

¶ 43    Nevertheless, despite the deficiencies in petitioner's appellant's brief, we decline to find his arguments have been forfeited or to dismiss his petition for administrative review. Petitioner's failure to abide by the requirements of Rule 341 was not so great that our review of the case is unduly hindered, nor is the appellate record especially complex. Accordingly, we elect to address the merits of his claim.

- 15 -

¶ 44                                    B. Unfair-Labor-Practice Claim

¶ 45          As stated, petitioner challenges the Board's rejection of his unfair-labor-practice claim. He argues he was removed from the TRU in retaliation for filing grievances.

¶ 46                                    1. *Standard of Review*

¶ 47          On appeal, the parties first disagree on the applicable standard of review. Petitioner asks this court to apply a *de novo* standard, arguing he is not challenging one of the Board's factual determinations but, rather, its application of "the facts to the law." Conversely, the Board and respondents argue that petitioner's appeal does present a challenge to one of the Board's factual findings and, as a result, the manifest-weight-of-the-evidence standard should apply. We agree with the Board and respondents.

¶ 48          Here, the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2014)) applies to our review of the Board's final decision. See 5 ILCS 315/11(e) (West 2014). In an administrative review proceeding, we review the agency's, *i.e.*, the Board's, final decision, not the findings of the ALJ. *Parikh v. Division of Professional Regulation of the Department of Financial & Professional Regulation*, 2012 IL App (1st) 121226, ¶ 31, 977 N.E.2d 1173. Under the Administrative Review Law, judicial review extends "to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3-110 (West 2014). "The proper standard of review in cases involving administrative review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50, 72 N.E.3d 288.

¶ 49          "An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct." *City of Belvidere v. Illinois State Labor Relations*

*Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998). When examining the Board's factual findings, we consider whether they are against the manifest weight of the evidence. *Id.* A factual finding is "contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident." *Id.* The Board's "findings on a question of law *** are reviewed with less deference" and are subject to a *de novo* standard of review. *Id.* at 205. Finally, where a "case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law" and is subject to a clearly erroneous standard. *Id.*

¶ 50       When an employer is alleged to have committed an unfair labor practice, the employer's motivation for taking a particular action presents a question of fact. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149-50 (1989) (stating that "because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence"). In this case, petitioner asserts that "the only question that is pending is whether [his] grievances were a 'motivating' factor in the decision to remove him from the TRU." Further, he challenges the Board's ultimate finding that it was the TRU members' lack of trust—rather than his filing of grievances—that was the basis, *i.e.*, motivating factor, for his removal. Accordingly, the question on review is one of fact and we apply a manifest-weight-of-the-evidence standard of review.

¶ 51                          2. *The Board's Decision*

¶ 52       Under section 10(a)(1) of the Act (5 ILCS 315/10(a)(1) (West 2014)), it is an unfair labor practice for an employer or its agents "to interfere with, restrain[,] or coerce public employees in the exercise of the rights guaranteed in th[e] Act." An employee may establish a *prima facie* case of a section 10(a)(1) violation, by showing that (1) he was engaged in a statutorily protected

activity, (2) the employer was aware of the nature of his conduct, and (3) the employer took adverse action against him for discriminatory reasons. *Pace Suburban Bus Division of the Regional Transportation Authority v. Illinois Labor Relations Board*, 406 Ill. App. 3d 484, 494-95, 942 N.E.2d 652, 661-62 (2010). Regarding the third basis for establishing a *prima facie* case, the employee must "show, by a preponderance of the evidence, that the adverse employment action was based in whole or in part on antiunion animus—or *** that the employee's protected conduct was a substantial or motivating factor in the adverse action." (Internal quotation marks omitted.) *City of Burbank*, 128 Ill. 2d at 345.

¶ 53        As stated, an employer's motive is a question of fact. *Id.* The Board may infer a discriminatory motive "from either direct or circumstantial evidence." *Id.* Factors from which antiunion motive may be inferred include (1) expressions of hostility toward union activity along with knowledge of the employee's union activities, (2) proximity in time between the union activities and the adverse action, (3) disparate treatment of employees or a pattern of conduct targeting union supporters for adverse action, (4) inconsistencies between the employer's proffered reason for the adverse action and other employer actions, and (5) shifting explanations for the adverse action. *Id.* at 345-46. Once an employee has established that the adverse action was based in part on antiunion animus, the employer can avoid a finding that it violated the Act by demonstrating that the employee would have been subject to the adverse action for a legitimate business reason notwithstanding the employer's antiunion animus. *Id.* at 346.

¶ 54        Here, the Board determined petitioner failed to establish a *prima facie* case of a section 10(a)(1) violation. We note there appears to be no dispute between the parties that petitioner's filing of grievances was a statutorily protected activity or that respondents knew of the

nature of that conduct. Instead, the parties dispute whether petitioner's removal from the TRU was for discriminatory reasons, *i.e.*, retaliation for his filing of grievances. Ultimately, the Board found petitioner failed to show that his filing of grievances "was the substantial or motivating factor in [r]espondents' decision to remove him from the TRU." Instead, it determined that "both the Miller Memo and Hayes Memo show[ed] the reason for [petitioner's] removal from the TRU was the TRU members' lack of trust in [petitioner]." 35 PERI ¶ 70. After reviewing the record, we find the Board's determination as to respondents' motivation was not against the manifest weight of the evidence.

¶ 55        As argued by the Board on appeal, evidence showed that trust among the TRU members was essential to the TRU's safe and effective operation. Those individuals with decision-making authority over the TRU—Hayes, Williams, and Roesch—each denied that petitioner's pursuit of grievances was the reason he was removed from the team. Each identified trust issues as the basis of his or her decision. Both Hayes and Roesch testified they were aware of reasons unrelated to the filing of grievances that affected the TRU members ability to trust petitioner and provided specific examples of those reasons. Further, both believed it was evidence of petitioner's behavior over time that cumulatively caused the trust issues with his teammates.

¶ 56        Additionally, as noted, 15 TRU members testified at the hearing before the ALJ. Each member testified he lacked trust in petitioner and agreed with the recommendation for his removal from the team. The vast majority of TRU members were questioned explicitly regarding the issue of grievances and denied that petitioner's filing of grievances was the cause of their trust issues or their desire for his removal from the team. Testimony from the TRU members established that the teams' "trust issues" resulted primarily from decisions petitioner made or behaviors he

- 19 -

exhibited, rather than the pursuit of grievances. The TRU members felt these decisions and behaviors, several of which were supported by specific examples, showed a lack of honesty and integrity.

¶ 57 Petitioner's argument on appeal does not address the specific testimony and evidence presented at the hearing before the ALJ. Rather, he challenges a particular statement the Board made in its decision regarding Miller's memo and the subject of grievances. Specifically, petitioner notes the following statement from the Board's decision:

"Although the filing of the grievances was mentioned, the Miller Memo clearly indicates the TRU members were not upset *because* [petitioner] filed grievances, rather, they were upset that the subject and nature of those grievances demonstrated [petitioner] would only look out for himself at the expense of fellow team members, which they felt was antithetical to the TRU." (Emphasis in original.) 35 PERI ¶ 70.

Petitioner argues this statement indicates the Board determined "he was retaliated against because of the relief he sought" in filing a grievance, which he maintains is the equivalent of retaliation for filing a grievance and should have the same consequences under the Act.

¶ 58 We disagree with petitioner's characterization of the Board's findings. The Board's decision does not reflect a determination that petitioner was "retaliated against based on the relief sought" in his grievances. Instead, in explaining its decision, the Board drew a distinction between (1) the TRU members being upset with petitioner because he filed grievances and (2) the TRU members being upset with petitioner because of what they believed the "subject and nature" of the grievances demonstrated about petitioner. It was the latter that the board considered along with other evidence reflecting the TRU members' distrust of petitioner in arriving at its decision.

¶ 59 Additionally, while there is some evidence that petitioner's fellow TRU members

were upset by his grievances, the record does not support a finding that the grievances were the sole, or even the most significant, issue affecting the TRU members' trust. Aside from petitioner's grievances, Miller's memo also documented issues with petitioner's FOIA requests and the manner in which petitioner exercised his "discretion when \*\*\* working." As discussed, the TRU members who testified at the hearing asserted multiple reasons for their lack of trust in petitioner that were unrelated to the issue of grievances.

¶ 60　　　　After reviewing the record, we find it contains sufficient support for the Board's finding that respondents were motivated by the TRU members' lack of trust in petitioner, rather than his filing of grievances, when deciding to remove him from the TRU. An opposite conclusion from that reached by the Board was not clearly evident.

¶ 61　　　　　　　　　　　　III. CONCLUSION

¶ 62　　　　For the reasons stated, we affirm the Board's decision.

¶ 63　　　　Affirmed.